132 T.C. No. 9

UNITED STATES TAX COURT

NEW PHOENIX SUNRISE CORPORATION AND SUBSIDIARIES, Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 23096-05.              Filed April 9, 2009.


P is the parent of a consolidated group of corporations and a wholly owned subsidiary S. During 2001 S sold substantially all of its assets, realizing a gain of about $10 million. Also during 2001, S entered into a transaction whereby: (1) S purchased from and sold to a foreign bank respectively a long and a short option in foreign currency, paying only the net premium to the foreign bank; (2) S and W, a part owner of P, formed partnership O; and (3) S contributed the long and short options to O, increasing its basis in O by the amount of the premium on the purchased long option but not reducing its basis by the amount of the premium on the sold short option. The long and short options expired worthless. Shortly thereafter the partnership dissolved and distributed shares of stock in Cisco Systems, Inc., to S in redemption of its partnership interest. S sold the stock for a small economic loss. On its consolidated return P claimed a loss of about $10 million on S' sale of the stock. P calculated the amount of the loss by claiming an inflated basis of about $10 million in the Cisco Systems, Inc. stock distributed by O. The

claimed $10 million loss was used to offset the $10 million gain on the sale of S' assets.  O filed an information return showing a loss on the expiration of the long and short options and allocating that loss to S and W.

Because O qualified as a small partnership under sec. 6231(a)(1)(B)(i), I.R.C., the unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, sec. 401, 96 Stat. 648, do not apply.  R issued a notice of deficiency to S, and P petitioned upon a consolidated return which included S.  The notice of deficiency disallowed the claimed loss on the sale of the stock, the claimed flowthrough loss from O, and claimed deductions for legal fees.  The notice was based in part on R's belief that the transaction entered into by P lacked economic substance and should be disregarded for Federal tax purposes.  The notice also imposed the penalty under sec. 6662, I.R.C.

Held:  The transaction S entered into lacked economic substance and is disregarded.

Held, further, the legal fees are not deductible by P.

Held, further, S is liable for sec. 6662, I.R.C., penalty.


John P. Tyler, Anthony J. Rollins, and Willard N. Timm, for petitioner.

R. Scott Shieldes and Kathryn F. Patterson, for respondent.


GOEKE, Judge:  Respondent determined a deficiency of $3,355,906 in petitioner's Federal income tax for 2001 and imposed a penalty under section 6662 of $1,298,284.[1]  For the

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code).

reasons stated herein, we uphold the determinations in the notice of deficiency and find the section 6662 penalty applicable.

## FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of fact and the accompanying exhibits are incorporated herein by this reference.

On April 30, 1973, the Pruett-Wray Cattle Co. was incorporated pursuant to the laws of the State of Arizona. In 1990 it changed its name to New Phoenix Sunrise Corp. (New Phoenix).

1. <u>Mr. Wray</u>

Timothy Wray (Mr. Wray) became president and CEO of New Phoenix in 1996. Mr. Wray graduated from Princeton University with a bachelor of arts degree and then obtained a master's degree in business administration from Stanford University. Mr. Wray was a member of the U.S. Rowing Team from 1990 through 1995. After graduating from college, but while still a member of the rowing team, Mr. Wray worked for Vanguard, a securities firm.

After retiring from rowing, Mr. Wray began to examine the family business, New Phoenix. At that time New Phoenix was managed by nonfamily members and experiencing financial difficulties. Mr. Wray worked to refinance the company's debt by securing a new lender and as part of the arrangement took over as president and CEO until New Phoenix's dissolution in 2001. In

addition to serving as New Phoenix's president and CEO, Mr. Wray worked from 1996 until 2001 as a research analyst for Questor Management Co., a private equity firm.

2. <u>Capital Poly Bag</u>

Capital Poly Bag, Inc. (Capital), was incorporated in 1972 under the laws of the State of Ohio. Capital manufactured plastic bags for sale to large institutions and had manufacturing facilities in Columbus, Ohio, and Atlanta, Georgia. New Phoenix purchased the stock of Capital in 1986. At all relevant times thereafter, Capital was a subsidiary of New Phoenix and filed consolidated income tax returns with the New Phoenix group of corporations.

3. <u>Elsea, Collins & Co.</u>

Elsea, Collins & Co. (Elsea Collins) was an accounting firm in Columbus, Ohio. Elsea Collins provided financial accounting and performed State and local tax work for Capital starting in the 1980s. During 2001 and 2002 James Hunter (Mr. Hunter) was a C.P.A. and a partner at Elsea Collins.

4. <u>Bricker & Eckler, L.L.P.</u>

Bricker & Eckler, L.L.P. (Bricker & Eckler), is a law firm based in Columbus, Ohio. Bricker & Eckler provided legal services for Capital from the 1970s until the company's dissolution. During 2001 and 2002 Gordon F. Litt (Mr. Litt) was an attorney and a partner at Bricker & Eckler.

5. <u>Joseph W. Roskos & Co.</u>

In 2001 and 2002 Joseph W. Roskos & Co. (Roskos & Co.) was a subsidiary of Bryn Mawr Bank Corp. in Bryn Mawr, Pennsylvania. Roskos & Co. provided office services, including accounting, consulting, tax services, and fiduciary support for high-net-worth individuals. Elsea Collins prepared New Phoenix's financial statements, upon which Roskos & Co. relied in providing services to New Phoenix.

In 2001 and 2002 Robert M. Fedoris (Mr. Fedoris) was Roskos & Co.'s president, and Andrew King (Mr. King) was an employee. Mr. Fedoris prepared New Phoenix's consolidated Form 1120, U.S. Corporation Income Tax Return, as well as Form 1065, U.S. Return of Partnership Income, for Olentangy Partners, discussed below.

6. <u>Jenkins & Gilchrist</u>

During 2001 and 2002 Jenkens & Gilchrist, P.C. (Jenkens & Gilchrist), was a law firm based in Dallas, Texas, with offices in Chicago, Houston, Austin, San Antonio, Los Angeles, and Washington, D.C.

7. <u>Sale of Capital</u>

In November 2000 negotiations commenced regarding the sale of substantially all of Capital's assets to Pitt Plastics, Inc., an unrelated third party (the asset sale). At the time, Capital was the only operating company within the New Phoenix consolidated group of corporations.

On April 24, 2001, the shareholders of New Phoenix approved the sale of substantially all of Capital's assets to Pitt Plastics, Inc. On April 30, 2001, the asset sale was consummated. Capital sold substantially all of its assets to Pitt Plastics, Inc., for $15,292,767. Mr. Litt represented New Phoenix in connection with the asset sale and also advised New Phoenix regarding the tax consequences of the asset sale and the contemplated liquidation of the New Phoenix group.

After the asset sale Mr. Wray became Capital's president, treasurer, and sole director. Capital realized a gain of $10,338,071 from the asset sale. After the asset sale Capital's only real asset consisted of approximately $11 million in cash. In July 2001 New Phoenix estimated that its gain from the asset sale was approximately $10.3 million.

8. Mr. Wray Meets Attorneys of Jenkens & Gilchrist

In the fall of 2001 Mr. Litt introduced Mr. Wray to Paul Daugerdas (Mr. Daugerdas) and John Beery (Mr. Beery) of Jenkens & Gilchrist. Messrs. Daugerdas and Beery were promoting a tax strategy called "Basis Leveraged Investment Swap Spread" (the BLISS transaction or the transaction at issue). A one-page executive summary of the BLISS transaction provided the following steps:

> 1. Taxpayer, through a single-member limited liability company treated as a disregarded entity for tax purposes, enters into two swaps (notional principal contracts) paying an upfront payment (yield adjustment fee) to acquire one

swap, and receiving an upfront payment with respect to the other. Such transaction is a nontaxable event, notwithstanding the receipt of cash proceeds as an upfront payment, however such amount (and the amount paid for the other swap) must be amortized into income and expense over the life of the swap. A business and/or investment reason for this investment strategy must exist (e.g., the position should hedge an investment, or currency prices will increase or decrease, etc.).

2. Taxpayer and another partner or his wholly owned S Corporation ("S Corp.") form a partnership or limited liability company designed to be taxed as a partnership (referred to herein as "Partnership"), in which Taxpayer is 99% partner, and S Corp. (or other party) is a 1% partner.

3. Taxpayer contributes the purchased swap entered into to the Partnership, together with the short swap. This contribution should result in Taxpayer's tax basis in his partnership or membership interest being equal to the cost of the swap contributed. The short swap is, more likely than not, not treated as a liability for tax purposes, achieving this result.

4. Throughout the duration of the swap, the Partnership makes or receives payments pursuant to the swap terms and conditions, and recognizes economic gain or loss on the transaction. At maturity, the swap terminates.

5. Partnership purchases foreign currency or marketable securities for investment. Alternatively, the Partnership may receive a capital asset as a contribution from its partners.

6. Taxpayer (and, other partner) contributes his stepped-up Partnership interest to S. Corp. This results in the Partnership only having one partner, and therefore it liquidates. This results in a step-up in the basis of the assets formerly held by Partnership to the stepped-up outside basis of the S. Corp. partner.

7. S Corp. sells the stepped-up assets, generating an ordinary or capital loss, as the case may be.

On November 15, 2001, Mr. Daugerdas sent Mr. Litt a blank information questionnaire pertaining to Mr. Wray and Capital.

Mr. Litt completed the questionnaire and returned it to Mr. Daugerdas the following day.  Jenkens & Gilchrist prepared documents and correspondence used to implement the BLISS transaction.

9.  Olentangy Partners

On or before November 19, 2001, Mr. Wray authorized Jenkens & Gilchrist to form Olentangy Partners.  Olentangy Partners was organized as a general partnership on November 19, 2001, pursuant to the laws of the State of Ohio.  The partnership agreement was signed by Mr. Wray, both in his individual capacity and as president of Capital.  The partnership agreement identifies Capital as having a 99-percent interest and Mr. Wray as having a 1-percent interest in Olentangy Partners.  Jenkens & Gilchrist prepared all documents related to the formation of Olentangy Partners and filed all documents for Olentangy Partners with the appropriate government agencies.  Olentangy Partners did not contemplate or engage in any activities other than the BLISS transaction.

10. Deutsche Bank AG

Deutsche Bank AG (Deutsche Bank) is an international bank headquartered in Germany with a branch office in London, England. The London branch does business as Deutsche Bank AG London Branch.  Deutsche Banc Alex. Brown (DBA Brown) is a licensed broker-dealer engaged in the securities brokerage business in the

United States. DBA Brown is a division of Deutsche Bank Subsidiaries, Inc., and Deutsche Bank Alex. Brown, L.L.C., which are indirect subsidiaries of Deutsche Bank.

11. <u>Options in General</u>

An option is a contract that gives the buyer the right, but not the obligation, to buy or sell an asset at a predetermined price (the strike price). In exchange for selling an option, the seller receives from the purchaser a premium which reflects the value of the option. The risk to a purchaser of an option is limited to the premium. The risk to the seller of an option can be unlimited; it is the difference between the strike price and the market price of the asset at expiration less the premium. A European option is one that can be exercised only on its expiration date. A digital option is one in which the payout is a fixed amount agreed to by the buyer and the seller at the time of the option's inception.

An option to purchase property such as foreign currency is "in the money" if at expiration the strike price is at or below the price at which the referenced currency is trading in the foreign currency market (the spot rate). An option to purchase such property is "out of the money" if at expiration the strike price is above the spot rate.

A European digital option on foreign currency typically expires at 10 a.m. New York time on the termination date

referenced in the option contract. The buyer of a European digital option on foreign currency typically pays an upfront premium in exchange for a predetermined payout if the option is in the money. This premium is typically expressed as a percentage of the payout and delineates the odds that the option will be in the money at the time of expiration.

An option spread trade involves the simultaneous purchase and sale of linked options. The purchase of one option is either partially or completely financed by the sale of another option at a different strike price. An option spread trade limits the gain the purchaser can realize on the options because the option sold puts a ceiling on the total profit. Similarly, the seller of the option spread has limited its potential loss to the amount of the spread purchaser's potential gain.

12. The Digital Option Spread

On or about November 30, 2001, Mr. Wray simultaneously opened two separate brokerage accounts with DBA Brown--one on behalf of Olentangy Partners (the Olentangy Partners account) and the other on behalf of Capital (the Capital account).

Capital purchased a digital option spread on the U.S. dollar/Japanese yen (USD/JPY) exchange rate from DBA Brown. On December 12, 2001, DBA Brown sent Mr. Berry letter agreements between Capital and Deutsche Bank AG London Branch for use in the

transaction.  The letter agreements included incorrect notional amounts.

On December 14, 2001, DBA Brown issued corrected letter agreements identifying each as a "Digital Swap Transaction" and describing purported transactions entered into between Deutsche Bank AG London Branch and Capital.  The letter agreements, Letter Agreement 533865-1/ODET 59299 (the long contract) and Letter Agreement 533866-1/ODET 59299 (the short contract), were dated December 14, 2001, identified the trade date as December 7, 2001, and had a corrected notional amount of $105 million.

Deutsche Bank gave Mr. Wray a choice of one of three currencies to use for the digital option spread:  The Japanese yen, the British pound, or the euro.  Mr. Wray chose the Japanese yen.  The long contract required Capital to pay:  (1) A premium of $10,631,250 on December 11, 2001, and (2) two other fixed payments of $63 million each, the first on December 14, 2001, and the second on December 20, 2001.  In exchange the long contract called for Deutsche Bank AG London Branch to make the following contingent payments:  (1) $73,631,250 on December 14, 2001, but only if the spot rate on the USD/JPY exchange rate at 10 a.m. on December 12, 2001, as determined by the calculation agent, was greater than or equal to ¥ 127.75; and (2) $73,631,250 on December 20, 2001, but only if the spot rate at 10 a.m. on

December 18, 2001, as determined by the calculation agent, was greater than or equal to ¥ 128.75.

The short contract called for Deutsche Bank AG London branch to pay:  (1) A premium of $10,368,750 on December 11, 2001, and (2) two other fixed payments of $63,065,625 each, one on December 14, 2001, and the other on December 20, 2001.  In exchange, the short contract called for Capital to make the following contingent payments:  (1) $73,500,000 on December 14, 2001, but only if the spot rate at 10 a.m. on December 12, 2001, as determined by the calculation agent, was greater than or equal to ¥ 127.77; and (2) $73,500,000 on December 20, 2001, but only if the spot rate at 10 a.m. on December 18, 2001, as determined by the calculation agent, was greater than or equal to  ¥ 128.77.

Capital and Deutsche Bank did not pay the full amounts of their respective premiums under the digital option spread. Instead, Capital paid the net difference of $262,500 (the $10,631,250 premium on the long contract minus the $10,368,750 premium on the short contract) on December 21, 2001.[2]

The short contract's strike prices (¥ 127.77 and ¥ 128.77) exceeded the long contract's strike prices (¥ 127.75 and ¥ 128.75) by only 2 pips.  A pip is one ten-thousandth of a quoted price in foreign exchange.  In USD/JPY terms, a pip is worth

---

[2]After Capital paid Deutsche Bank $262,500, Deutsche Bank returned $131,250, leaving Capital at risk for the remaining $131,250.

$0.0008. Both contracts listed Deutsche Bank as the calculation agent. As discussed more fully below, Deutsche Bank's role as calculation agent limited the profit potential of the transaction.

On December 17, 2001, Jenkens & Gilchrist forwarded to Mr. Wray the remaining documents necessary to implement the BLISS transaction. The package consisted of: (1) Letter agreements memorializing the digital option spread; (2) an agreement assigning the digital option spread to Olentangy Partners; (3) an agreement liquidating Olentangy Partners; and (4) correspondence authorizing DBA Brown to transfer the digital option spread to Olentangy Partners, to purchase and sell securities, and to make certain deposits to and withdrawals from the Capital and Olentangy Partners accounts. Many of the documents were not dated, and Jenkens & Gilchrist advised Mr. Wray not to date the documents.

On December 18, 2001, the digital option spread expired worthless. On December 20, 2001, Mr. Wray signed and returned the above-referenced documents to Jenkens & Gilchrist. Mr. Wray also sent copies to Mr. Litt. That same day Jenkens & Gilchrist forwarded to DBA Brown the assignment agreement and the letter signed by Mr. Wray authorizing the assignment of the digital option spread to Olentangy Partners. The assignment agreement and the letter were both dated December 7, 2001. They were among

the documents that Mr. Wray signed on December 20, 2001, but was told not to date.

Pursuant to the assignment agreement and Mr. Wray's letter, DBA Brown transferred the digital option spread from the Capital account to the Olentangy Partners account. In contributing the digital option spread to Olentangy Partners, Capital stepped up its outside basis in Olentangy Partners by the amount of the long position's premium but did not reduce its outside basis by the amount of the transferred short position's premium. On December 24, 2001, DBA Brown transferred the amount of $393,740 from the Capital account to the Olentangy Partners account as a capital contribution. Also on that same day, Olentangy Partners purchased 8,110 shares of Cisco Systems, Inc. stock for $149,958 (the Cisco stock).

Pursuant to the liquidation agreement signed by Mr. Wray, Olentangy Partners was liquidated effective December 26, 2001, and as of that date DBA Brown liquidated the Olentangy Partners account and transferred the Cisco stock and $304,839 from that account to the Capital account.

On December 28, 2001, Capital sold the 8,110 shares of the Cisco stock for $148,467, realizing an economic loss of $1,491 from the sale.

13.  The IRS Response to Alleged Abusive Tax Shelters

On February 28, 2000, the Department of the Treasury (Treasury Department) issued temporary regulations requiring corporate taxpayers to disclose listed and other reportable transactions.  Sec. 301.6111-2T, Temporary Income Tax Regs., 65 Fed. Reg. 11218 (Mar. 2, 2000).  Notice 2000-44, 2000-2 C.B. 255, was issued on August 11, 2000, and published in the Internal Revenue Bulletin on September 5, 2000.  Notice 2000-44, 2000-36 I.R.B. 255.  The notice warned taxpayers of transactions calling for the simultaneous purchase and sale of offsetting options which were then transferred to a partnership.  The notice determined that the purported losses from such offsetting option transactions did not represent bona fide losses reflecting actual economic consequences and that the purported losses were not allowable for Federal tax purposes.  See Jade Trading, LLC v. United States, 80 Fed. Cl. 11 (2007).

14.  Reporting of the Transaction

On February 20, 2002, Mr. Hunter calculated Capital's gain from the asset sale.  Of the total, he attributed $1,115,967 to ordinary gain and $9,222,104 to capital gain.

On April 18, 2002, Mr. Litt emailed Mr. Daugerdas to inform him that he felt incapable of advising New Phoenix's accountants regarding the proper reporting of the BLISS transaction.  Mr. Litt anticipated questions from Roskos & Co. concerning whether

the BLISS transaction had to be reported as a listed transaction or as a confidential corporate tax shelter.

On May 29, 2002, Mr. Litt emailed Mr. Wray, attaching a copy of a news article about the Treasury Department's action regarding abusive tax shelters. In the email Mr. Litt suggests that in view of the news article and possible Treasury Department action, it was important to prepare and file the New Phoenix tax returns as soon as possible.

The Treasury Department amended its temporary regulations regarding disclosure requirements, effective June 14, 2002, to include noncorporate taxpayers who directly or indirectly entered into listed transactions on or after January 1, 2000. 67 Fed. Reg. 41324-01 (June 18, 2002).

On June 25, 2002, Mr. Litt and Mr. Daugerdas spoke, and they discussed the June 14, 2002, Treasury Department amendments as well as the section 6662 accuracy-related penalty. Mr. Daugerdas indicated that the June 14, 2002, amendments applied to the BLISS transaction and that not disclosing it was an aggressive position to take.

On June 26, 2002, Jenkens & Gilchrist issued a written tax opinion to Capital concerning treatment of the BLISS transaction. The opinion concluded that Capital would more likely than not prevail if the Internal Revenue Service (IRS) challenged Capital's Federal income tax reporting of the BLISS transactions.

Mr. Wray instructed New Phoenix's advisers and return preparers to prepare New Phoenix's Federal income tax returns in accordance with the Jenkens & Gilchrist opinion letter.

On July 1, 2002, Mr. Litt discussed the June 14, 2002, amendments with Mr. Wray and informed him that not disclosing the BLISS transaction was an aggressive position requiring approval of New Phoenix's tax return preparer.

On July 8, 2002, Mr. Wray sent Mr. Litt an email indicating his intention of taking as aggressive a position as possible in filing the return. On July 11, 2002, Mr. Daugerdas and Mr. Litt discussed the possibility that the BLISS transaction was substantially similar to those transactions discussed in Notice 2000-44, supra; the section 6662 accuracy-related penalty; and the potential of being audited if New Phoenix disclosed the BLISS transaction.

On July 26, 2002, Roskos & Co. sent draft copies of Federal tax returns for 2001 for Capital and New Phoenix to Mr. Daugerdas and Mr. Hunter. A letter enclosed with the drafts indicated that Mr. Wray wanted to file the returns as soon as possible in view of the new regulations. A second set of draft returns was sent on August 29, 2002. The second set included two different versions of Capital's Schedules M-1, Reconciliation of Income (Loss) per Books With Income per Return, and Schedules M-2, Analysis of Unappropriated Retained Earnings per Books, and

attached statements.  The difference between the two versions was in how the BLISS transaction was reported.  The first version included a Schedule M-1 adjustment on line 8, Deductions on this return not charged against book income this year, of $10,588,013, to show the book to tax difference of the sale of the Cisco stock.  The second version did not include any adjustment regarding the sale of the Cisco stock.

On September 19, 2002, New Phoenix filed a consolidated Form 1120 for the taxable year ending December 31, 2001.  The Form 1120 was signed on behalf of New Phoenix by Mr. Wray as president and Mr. Fedoris as paid tax return preparer.  The return reported a Federal income tax liability of $261,977.  New Phoenix reported a net capital gain of $9,222,104 and an ordinary gain of $1,115,967 from the asset sale.  On Schedule D, Capital Gains and Losses, New Phoenix reported a $10,504,462 loss on the sale of the Cisco stock by Capital.  To arrive at this amount New Phoenix reported a sale price of $148,474 and an adjusted basis in the Cisco stock of $10,652,936.  New Phoenix derived this adjusted basis from Capital's stepped-up basis in Olentangy Partners less cash distributions.  New Phoenix also reported $129,897 as Capital's distributive share of loss from Olentangy Partners and claimed a deduction of $500,000 for payments to Jenkens & Gilchrist.

The New Phoenix consolidated return Schedule M-1 did not include an adjustment to account for the difference between book and tax treatment of the sale of the Cisco stock. The attached statement showing Schedule M-1 adjustments for New Phoenix subsidiaries also did not contain a Schedule M-1 adjustment for Capital to account for the difference in treatment.

On or about November 6, 2002, Olentangy Partners filed an information return reporting a loss of $131,250 from the digital option spread's expiring worthless. Of this loss, Olentangy Partners reported Capital's distributive share as $129,938 and Mr. Wray's distributive share as $1,312. On Capital's Schedule K-1, Partner's Share of Income, Credits, Deductions, etc., Olentangy Partners reported capital contributions of $11,018,428 and distributions of $10,888,531. On Mr. Wray's Schedule K-1, Olentangy Partners reported capital contributions of $6,562 and distributions of $5,250. On or about October 22, 2002, Mr. Wray filed his Federal income tax return for tax year 2001. In reporting the BLISS transaction for Federal income tax purposes, New Phoenix and its officers and advisers relied solely on the advice of Jenkens & Gilchrist.

On September 14, 2005, respondent issued a timely notice of deficiency (the notice) to petitioner.[3] The notice determined a

_____

[3]The unified audit and litigation procedures of the Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-
(continued...)

deficiency in income tax of $3,355,906 and imposed a penalty of $1,298,284 pursuant to section 6662.  Attached to the notice was an explanation of items which provided various grounds for the disallowance of the claimed $10,504,462 loss on the sale of the Cisco stock and for the imposition of the section 6662 penalty.

On December 8, 2005, a petition was filed on behalf of New Phoenix.  A trial was held on January 22 and 23, 2008, during the Court's Atlanta, Georgia, session.  Petitioner produced three fact witnesses and one expert witness.  Respondent produced two expert witnesses.  Pursuant to section 7482(b)(2), the parties stipulated that the decision in this case will be appealable to the Court of Appeals for the Sixth Circuit.

OPINION

I.  Introduction

Respondent makes arguments in support of the notice of deficiency including that the digital option spread is a sham lacking economic substance; that Olentangy Partners was a sham and should be ignored for Federal income tax purposes; and, should we find economic substance in the digital option spread

---

[3](...continued)
248, sec. 401, 96 Stat. 648, do not apply to Olentangy Partners. Olentangy Partners qualifies as a small partnership under sec. 6231(a)(1)(B)(i) and did not elect pursuant to sec. 6231(a)(1)(B)(ii) to have TEFRA apply.  See Wadsworth v. Commissioner, T.C. Memo. 2007-46 ("The small partnership exception permits this Court to review in a deficiency suit items that otherwise would be subject to partnership-level proceedings.").

and respect Olentangy Partners as a partnership, that petitioner treated the digital option spread incorrectly on its return.

Separately, respondent argues that because the transaction lacks economic substance, New Phoenix is not entitled to deduct the $500,000 paid to Jenkens & Gilchrist.

Lastly, respondent argues that should we uphold his determinations, New Phoenix is liable for an accuracy-related penalty based upon the resulting underpayment. The notice determined a variety of section 6662 penalties. Respondent argues that a section 6662(h) 40-percent gross valuation penalty applies because New Phoenix made a gross valuation misstatement by overstating its basis in the Cisco stock. Should we find that New Phoenix did not make a gross valuation misstatement, respondent argues that a 20-percent penalty should be imposed because New Phoenix made a substantial understatement of income tax on its return and acted negligently by disregarding Notice 2000-44, supra. Anticipating petitioner's claimed reasonable cause and good faith defense, respondent argues that New Phoenix was not reasonable in relying on the Jenkens & Gilchrist opinion letter because it was issued by a promoter of the transaction.

II. Burden of Proof

In general, the burden of proof with regard to factual matters rests with the taxpayer. Under section 7491(a), if the taxpayer produces credible evidence with respect to any factual

issue relevant to ascertaining the taxpayer's liability and meets other requirements, the burden of proof shifts from the taxpayer to the Commissioner as to that factual issue. Because we decide this case on the basis of the preponderance of the evidence, we need not decide upon which party the burden rests.

III. Sham Transaction Doctrine

As stated above, the parties have stipulated that an appeal in this case would lie in the Court of Appeals for the Sixth Circuit. Pursuant to Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), we follow the law of that Court of Appeals as it applies to this case.

"The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted." Gregory v. Helvering, 293 U.S. 465, 469 (1935). However, even if a transaction is in formal compliance with Code provisions, a deduction will be disallowed if the transaction is an economic sham. Am. Elec. Power Co. v. United States, 326 F.3d 737, 741 (6th Cir. 2003).

The Court of Appeals for the Sixth Circuit has stated that "'The proper standard in determining if a transaction is a sham is whether the transaction has any practicable economic effects other than the creation of income tax losses.'" Dow Chem. Co. v. United States, 435 F.3d 594, 599 (6th Cir. 2006) (quoting Rose v.

Commissioner, 868 F.2d 851, 853 (6th Cir. 1989), affg. 88 T.C. 386 (1987)). "If the transaction has economic substance, 'the question becomes whether the taxpayer was motivated by profit to participate in the transaction.'" Id. (quoting Illes v. Commissioner, 982 F.2d 163, 165 (6th Cir. 1992), affg. T.C. Memo. 1991-449). "'If, however, the court determines that the transaction is a sham, the entire transaction is disallowed for federal tax purposes'," id., and no subjective inquiry into the taxpayer's motivation is made, id. A court "will not inquire into whether a transaction's primary objective was for the production of income or to make a profit, until it determines that the transaction is bona fide and not a sham." Rose v. Commissioner, supra at 853.

Accordingly, we must first determine whether the BLISS transaction had any practical economic effect. Dow Chem. Co. v. United States, supra at 599. The presence or lack of economic substance for Federal tax purposes is determined by a fact-specific inquiry on a case-by-case basis. Frank Lyon Co. v. United States, 435 U.S. 561, 584 (1978). If we find that the BLISS transaction did in fact have a practical economic effect, we will then look to Mr. Wray's and New Phoenix's motives in entering into the transaction at issue.

IV. Economic Effect

A. Respondent's Arguments

Respondent argues that the transaction lacked economic substance and should therefore be disregarded. Respondent premises this argument on two factors: (1) That the digital option spread had no practical economic effect, and (2) that the transaction served no business purpose and was developed as a tax avoidance mechanism and not an investment strategy.

1. Practical Economic Effect

Respondent argues that a prudent investor would not have engaged in the digital option spread because there was no reasonable possibility, after taking into account transaction costs, of making a profit. Respondent contends that Capital paid Deutsche Bank a net amount of $131,250 in exchange for four possible outcomes:

> (1) If the contracts were "out of the money" on both expiration dates, Capital would lose its $131,250 net investment;
>
> (2) If the contracts were "in the money" on only one expiration date, Capital would break even;
>
> (3) If the contracts were "in the money" on both expiration dates, Capital would earn a maximum net profit of $131,250;
>
> (4) If the long contract was "in the money" and the short contract was "out of the money" on one or both of the two expiration dates, Capital could earn either $73 million or $147 million, referred to as hitting the "sweet spot."

Although it appears that respondent is conceding economic substance on the basis of the third and fourth possible outcomes,

respondent argues that any profits in scenario 3 were dwarfed by the transactions fees, while hitting the "sweet spot" was not possible.

Concerning the third possible outcome, respondent argues that although a profit potential existed if both contracts expired in the money, it would not be a true economic profit because the fees Capital paid to enter into the transaction, including fees paid to Deutsche Bank and the $500,000 paid to Jenkens & Gilchrist, would exceed any amount Capital earned.

Regarding the fourth possible outcome, respondent relies on expert testimony concerning two factors that in his view prevent Capital from ever hitting the "sweet spot". Respondent produced two expert witnesses--Steven Pomerantz (Dr. Pomerantz) and Thomas P. Murphy (Mr. Murphy). Dr. Pomerantz holds a Ph.D. in mathematics from the University of California at Berkeley and has taught classes in statistics, probability, operations research, and finance at both the undergraduate and graduate level. Dr. Pomerantz has also worked in the investment community for more than 20 years, holding positions in research and management for fixed income, equities, derivatives, and alternative investments at several major firms.

Mr. Murphy received a B.A. in psychology and economics from the University of Pennsylvania and an M.B.A. in finance and accounting from Columbia Business School. Mr. Murphy has worked

in the foreign exchange markets for about 25 years, as a market maker providing quotes to customers, a buy-side user seeking quotes from market makers, and as a manager of both.

The crux of respondent's argument is that although there was a very small theoretical possibility of hitting the "sweet spot", the structure of the transaction and industry practice lowered that theoretical possibility to zero.

Dr. Pomerantz testified about the probabilities of the following outcomes:  (1) There was a 95.8-percent chance that neither option would pay, and Capital would lose its $131,250 investment; (2) there was a 3.4-percent chance that one option would pay, and Capital would break even; (3) there was a 0.6-percent chance that both options would pay, earning Capital a $131,250 profit; and (4) there was a 0.2-percent chance that Capital would hit at least one "sweet spot", earning at least $73 million.  Dr. Pomerantz further testified that taking into account the costs associated with entering into the BLISS transaction, Capital would lose money in the first three scenarios.

Mr. Murphy also testified about Capital's chances of hitting either "sweet spot".  Mr. Murphy testified that the probability of the long option's hitting the "sweet spot" was 0.182 percent, and the probability of the short option's hitting the "sweet spot" was 0.115 percent.  Mr. Murphy also testified that during

his currency trading career he had never entered into a spread trade where the strike prices were so narrow.

Respondent argues further that even if we find the small percentage chance of hitting the "sweet spot" to be sufficient to satisfy the first prong of Dow Chemical, the digital option spread, and accordingly the BLISS transaction, ultimately lacked economic substance because Deutsche Bank could in effect prevent hitting the "sweet spot" either by virtue of its being the calculation agent or by taking advantage of its large trading position to move the market and the strike price itself.

Mr. Murphy testified that pursuant to industry practice hitting the "sweet spot" was impossible. Mr. Murphy's conclusion centered on Deutsche Bank's role as calculation agent, which made this result impossible. Mr. Murphy's expert report defined the calculation agent as the entity, normally the seller of the digital option structure, that determined whether the payout event occurred at expiration on the termination date. Mr. Murphy explained that to make this determination in 2001, the calculation agent would contact four other banks for a spot price. The other banks would then provide a range within which they would be willing to buy and sell the particular currency pair. Mr. Murphy testified that in 2001 industry practice was such that the counterparty banks contacted always gave a spread that was at least 3 pips wide. Mr. Murphy further explained that

the calculation agent would then choose any rate within the range provided by the four banks.

In Mr. Murphy's view, hitting the "sweet spot" was impossible because Deutsche Bank was the calculation agent for the digital option spread and, facing the prospects of making a large payout to Capital if the "sweet spot" was hit, could simply choose a rate from those provided by the four other banks that was most beneficial to Deutsche Bank. Respondent, relying on Mr. Murphy's testimony, argues that hitting the "sweet spot" was impossible because the option spreads were 2 pips wide and the market spread was 3 pips wide in accordance with industry practice. Respondent contends that Deutsche Bank would never use the "sweet spot" as the calculation rate, thereby allowing itself to avoid making the large payments required.

Mr. Murphy provided the following example in his report:

Example: On the day of expiration at 10:00 AM, the spot FX market is trading around the strike prices of the USD/JPY option. CPD is long USD/JPY Digital Call with a strike price at 127.75 and short a USD/JPY Digital Call with a strike price at 127.77. DB calls 4 banks for prices in USD/JPY and receives the following quotes:

    i.   Bank A: USD/JPY 127.75 - 127.78
    ii.  Bank B: USD/JPY 127.74 - 127.77
    iii. Bank C: USD/JPY 127.73 - 127.76
    iv.  Bank D: USD/JPY 127.72 - 127.75

DB has complete discretion as to where the 10:00 AM rate should be. DB can determine that all the options are out of the money by setting the rate at 127.72, 127.73 or 127.74 and no payout is made. Alternatively, and less likely, DB could set the calculation rate at 127.77 or 127.78 and thus both options would have paid out for a small profit to CPB.

The sweet spot would have occurred only if the fixing were either 127.75 or 127.76 and DB would have complete discretion not to set it at those rates. * * * This shows that there was no way the sweet spot was going to be paid out.

In addition to the above arguments, respondent argues that Deutsche Bank, on account of its ability to make large-volume trades, would be able to manipulate the market in such a way as to make sure that the "sweet spot" was unattainable.

### 2. Lack of Business Purpose

In addition to the digital option spread's alleged inherent lack of profitability, respondent argues that the BLISS transaction served no business purpose because it was developed as a tax avoidance mechanism and not as an investment strategy. Respondent contends that the true purpose behind Capital's entering into the BLISS transaction was to reduce the consolidated tax liability of the New Phoenix group of corporations. Respondent points to memorandums produced by Mr. Wray and sent to New Phoenix shareholders, documents related to the promotion and implementation of the transaction, and Deutsche Bank's control over the terms of the contracts.

Respondent points to memorandums prepared by Mr. Wray and sent to New Phoenix shareholders on July 31 and December 20, 2001, to support respondent's contention that the transaction was entered into for tax avoidance purposes. The July 31, 2001, memorandum states in part that New Phoenix planned to take steps

to "reduce the potential tax burden by approximately $2 million". The December 20, 2001, memorandum states in part:

> [New Phoenix] has determined, subject to receipt of written confirmation of such opinion of tax counsel, to take an aggressive tax position which will permit a significantly greater proceeds amount * * * from the sale of CPB to be distributed to the shareholders.

Respondent also points to Deutsche Bank's control over the terms of the digital option spread contracts, including setting the possible currencies, the strike prices, the expiration dates, and the premiums. Respondent argues that Deutsche Bank's limiting of Capital's potential profit and its own risk shows the fictional character of the BLISS transaction.

Lastly respondent argues that the assignment of the options to Olentangy Partners is evidence of the tax avoidance nature of the transaction because there was no reason to contribute the options other than to claim tax benefits.

B. Petitioner's Arguments

1. Economic Effect

Petitioner argues that the digital option spread and the BLISS transaction did in fact have economic effect. Petitioner argues that similar trades were done for purely economic reasons outside of the potential tax benefits present in the instant case.

Petitioner points to testimony by its expert witness, Scott Hakala, Ph.D. (Dr. Hakala), in support of its argument. Dr.

Hakala earned a Ph.D. in economics, focusing on monetary and financial theory and international finance from the University of Minnesota in 1989. From 1982 to 1992 Dr. Hakala taught courses in international finance at both the undergraduate and master's level at Southern Methodist University. For the past 15 years Dr. Hakala has served as a consultant on international finance. Dr. Hakala concluded that (1) the commercial terms of the digital option spread were priced consistently with market conditions and prices, and (2) the digital option spread provided a prospect of economic gain for Capital. Dr. Hakala's conclusions were based on extensive study of market conditions, trends, and pricing of the USD/JPY exchange rate for the year before the trade date. Dr. Hakala testified that this data supported Mr. Wray's belief that the U.S. dollar would increase in value relative to the Japanese yen.

Petitioner disputes respondent's contention that Deutsche Bank had total control over the outcome of the digital option spread and would never allow Capital to profit because Deutsche Bank could manipulate the spot rate or manipulate the market to affect the spot rate.

Disputing respondent's expert testimony concerning industry practices in 2001, petitioner contends that the spot rate was determined by the Federal Reserve Board and could not be altered by Deutsche Bank as respondent argues. Petitioner contends that

the confirmation documents and all included terms are governed by the International Swaps and Derivatives Association, Inc. (ISDA), and assorted ISDA documents and policies.

Petitioner further contends that Deutsche Bank had neither the motivation nor the ability to manipulate the market. Petitioner argues that Deutsche Bank simply served as a broker-dealer in this transaction and, acting in accordance with standard broker-dealer practice, would enter into an offsetting transaction to the digital option spread. This offsetting transaction, petitioner argues, would remove any risk to Deutsche Bank and any conflict of interest that would cause Deutsche Bank to selectively choose the market rate. Petitioner also points to the size of the foreign exchange market as proof of Deutsche Bank's inability to manipulate the market by virtue of its large trading position, arguing that Deutsche Bank would not attempt to make large trades in order to move the market because that would open Deutsche Bank to risk on other contracts with other parties.

### 2. Lack of Business Purpose

Petitioner disputes respondent's contention that the digital option spreads were assigned to Olentangy Partners simply to produce tax benefits. Petitioner argues that the digital option spread was transferred to Olentangy Partners in order to compensate Mr. Wray. Mr. Wray testified that over the course of his time with New Phoenix he was not compensated on a day-to-day

basis but instead would receive equity in New Phoenix according to the type of work he did for the company. Mr. Wray further testified that because he was not compensated on a day-to-day basis, he would not be able to share any profits that New Phoenix received on account of the BLISS transaction. Mr. Wray stated that transferring the digital option spreads to Olentangy Partners would allow him, as a partner in the partnership, to receive a share of any profits in a way that his normal compensation from New Phoenix would not.

C. Conclusion

We agree with respondent that the BLISS transaction lacks economic substance and fails the first prong of Dow Chem. Co. v. United States, 435 F.3d 594 (6th Cir. 2006).

1. Economic Loss

We note at the outset that neither Mr. Wray, New Phoenix, nor Capital actually suffered a $10 million economic loss during 2001. The loss claimed as a result of the stepped-up basis in the Cisco stock was purely fictional. Although Capital purchased and sold the long option to Deutsche Bank for a premium, it paid only the difference between the long and short options. See Jade Trading, LLC v. United States, 80 Fed. Cl. at 45; Maquire Partners-Master Invs., LLC v. United States, 103 AFTR 2d 763, 772, 2009-1 USTC par. 50,215, at 87,444 (C.D. Cal. 2009) ("First, the claimed basis is fictional, because * * * [the taxpayers]

paid only $1.5 million and $675,000, * * * but gained an increased basis of $101,500,000 and $45,675,000, respectively."); see also <u>Kornman & Associates, Inc. v. United States</u>, 527 F.3d 443, 456 (5th Cir. 2008) ("The Trust acknowledges that it only suffered a $200,000 economic loss in connection with these transactions, yet it claimed a $102.6 Million tax loss on its return."); <u>Cemco Investors, L.L.C. v. United States</u>, 515 F.3d 749, 750-751 (7th Cir. 2008); <u>Klamath Strategic Inv. Fund, L.L.C. v. United States</u>, 472 F. Supp. 2d 885, 894 (E.D. Tex. 2007).

2. <u>Deutsche Bank Controlled the Market Rate</u>

Petitioner points to Mr. Wray's testimony concerning his background and research into currency markets before entering into the BLISS transaction as evidence that a reasonable investor would enter into this type of transaction. While we do not discount and respondent does not disregard Mr. Wray's education and experience in the field of finance, documents prepared by Jenkens & Gilchrist to promote the BLISS transaction cast doubt on Mr. Wray's proffered reasons for entering into the transaction. The one-page executive summary discussed above provided in part that "A business and/or investment reason for this investment strategy must exist (e.g., the position should hedge an investment, or currency prices will increase or decrease, etc.)." Mr. Wray's testimony that he decided to enter into the transaction after researching currency markets served

only as an attempt to make an illegitimate transaction appear to have a legitimate basis.

Respondent's experts credibly testified that on the basis of industry practice the BLISS transaction had no realistic probability of earning a profit. As respondent argues, the documents memorializing the digital option spread list Deutsche Bank as the calculation agent. Although petitioner argues that Deutsche Bank would not intentionally choose a market rate to avoid making a payment, it is important to note that the contracts specifically state that neither party owes a fiduciary duty to the other. Because Deutsche Bank acted as calculation agent, and because the strike price of the options was only 2 pips, Deutsche Bank would always be able to choose a market rate outside that range. Capital never had a true opportunity to earn a profit because Deutsche Bank would never let that happen. To do so would be to voluntarily make itself liable for payments of more than $70 million. See Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. 636, 693 (2008).

The digital option spread was a closed transaction and Olentangy Partners soon disappeared. There could be no chance of future profits, much less future profits "consistent with the taxpayer's actual past conduct." Dow Chem. Co. v. United States, supra at 602 n.14. A prudent investor would not have entered into the BLISS transaction.

3. <u>Contribution to Partnership</u>

Respondent argues that Capital and Mr. Wray's formation of Olentangy Partners was necessary so that Capital could assign its inflated interest in Olentangy Partners to another asset--the Cisco stock. Respondent further contends that this was done for one reason: to claim a noneconomic tax loss of more than $10 million when that stock was finally sold. Respondent concludes by arguing that this lends support to his argument that the BLISS transaction lacked economic substance.

Petitioner argues that the digital option spread was contributed to Olentangy Partners in order to allow Mr. Wray to participate in any profits that might be earned. Mr. Wray also testified that the digital option spread was contributed in order to allow him to take part in any profits earned by the transaction.

We do not find Mr. Wray credible on this point. The contribution of the options to Olentangy Partners was required in order to claim the tax benefits of the BLISS transaction. <u>Jade Trading, LLC v. United States</u>, <u>supra</u> at 46 ("Funneling the trades through the partnership * * * was crucial for tax purposes to have the individual partners contribute the spreads to Jade and redeem the unexercised spreads from Jade in order to generate the inflated bases."); <u>Maguire Partners-Master Invs., LLC v. United States</u>, <u>supra</u> at 772, 2009-1 USTC par. 50,215, at 87,444 ("there

is no evidence that the contribution to the partnerships, which was part of the design of the prepackaged transactions, had any effect 'on the investment's value, quality, or profitability.' However, the contribution was required for the creation of an increased basis."); Stobie Creek Invs., LLC v. United States, supra at 694 ("This series of routings through the various investment vehicles * * * nevertheless, were an integral requirement for achieving the basis-enhancing effects of the J & G strategy, demonstrating the primary structure and function of these FXDOT as tax-planning instruments over their nominal structure and function as investments."). By contributing the digital option spread to Olentangy Partners, Capital was able to increase its basis in the partnership by the value of the purchased long option, while ignoring the sold short option under Helmer v. Commissioner, T.C. Memo. 1975-160, and its progeny.[4]

The BLISS transaction executive summary discussed above sheds light on the decision to contribute the digital option spread to Olentangy Partners and lends support to respondent's argument that the transaction as a whole lacked economic substance. Step 3 of the summary provided that

---

[4]We do not decide whether Helmer v. Commissioner, T.C. Memo. 1975-160, requires or allows this treatment of the contributed short option. Because we find the BLISS transaction lacked economic substance, we do not consider respondent's alternative arguments in support of the notice.

Taxpayer contributes the purchased swap entered into to the partnership, together with the short swap. This contribution should result in taxpayer's tax basis in his partnership or membership interest being equal to the cost of the swap contributed. The short sale swap is, more likely than not, not treated as a liability for tax purposes, achieving this result.

Absent the benefit of the claimed tax loss, there was nothing but a cashflow that was negative for all relevant periods--the "'hallmark[] of an economic sham'" as the Court of Appeals for the Sixth Circuit has held. Dow Chem. Co. v. United States, 435 F.3d at 602 (quoting Am. Elec. Power Co. v. United States, 326 F.3d 737, 742 (6th Cir. 2003). Such a deal lacks economic substance. Id. Because we find that the transaction at issue lacked economic substance, we do not consider Mr. Wray's and Capital's profit motive in entering into the transaction. Id. at 605; Illes v. Commissioner, 982 F.2d at 165; Rose v. Commissioner, 868 F.2d at 853. Pursuant to the aforementioned cases, the BLISS transaction must be ignored for Federal income tax purposes. Accordingly, the overstated loss claimed as a result of the sale of the CISCO stock is disregarded, as is the flowthrough loss from Olentangy Partners.

Because we find that the BLISS transaction lacked economic substance, we do not consider respondent's alternative arguments in support of the notice.

V. <u>Fees</u>

We next consider fees related to the BLISS transaction. On its Federal income tax return New Phoenix claimed a deduction of $500,000 for fees paid to Jenkens & Gilchrist to implement the BLISS transaction and to provide the written tax opinion. Petitioner alleges that respondent erred by disallowing the claimed deduction.

Respondent argues that petitioner is not entitled to deduct the legal fees because the transaction at issue lacked economic substance. Respondent relies on <u>Winn-Dixie Stores, Inc. & Subs. v. Commissioner</u>, 113 T.C. 254, 294 (1999), affd. 254 F.3d 1313 (11th Cir. 2001), and <u>Brown v. Commissioner</u>, 85 T.C. 968, 1000 (1985), affd. sub nom. <u>Sochin v. Commissioner</u>, 843 F.2d 351 (9th Cir. 1988). Respondent argues that petitioner cannot deduct the fees because those expenses relate to a transaction that lacks economic substance.

Petitioner contends that respondent's reliance on <u>Winn-Dixie Stores, Inc. & Subs.</u> and <u>Brown</u> is inappropriate. Petitioner argues that the fees at issue in those cases were administrative fees connected with a disregarded corporate-owned life insurance plan. Petitioner, however, argues that the fees paid to Jenkens & Gilchrist were not administrative fees and are deductible under <u>Saba Pship. v. Commissioner</u>, T.C. Memo. 1999-359, vacated and remanded 273 F.3d 1135 (D.C. Cir. 2001).

Petitioner's reading of <u>Saba Pship.</u> is overly broad.  The Court in <u>Saba Pship.</u> did not impose a broad rule that all nonadministrative fees paid in connection with a disregarded transaction are allowed as deductions.  In <u>Saba Pship.</u>, we held that where the taxpayer's purchases of private placement notes (PPNs) and certificates of deposit (CDs) were disregarded for lack of economic substance, and because the taxpayer was not required to include in income payments received pursuant to the purchase and sale of those PPNs and CDs, the taxpayer was not entitled to deduct fees related to those transactions.  <u>Id.</u> Where the taxpayer was required to include in income payments received from their participation in the purchases and sales, it was allowed to deduct related fees.

Jenkens & Gilchrist was paid $500,000.  However, the invoice does not provide any detail concerning what the fees were for; it simply states that the $500,000 was for legal services rendered. Jenkens & Gilchrist was intimately involved in the development, promotion, sale, and implementation of the BLISS transaction and provided a tax opinion meant to shield the purchaser from penalties should the transaction be challenged.  A finding that the BLISS transaction lacks economic substance does not trigger an inclusion of the type of income to petitioner that justified the deduction of related fees in <u>Saba Pship. v. Commissioner</u>, <u>supra</u>.  Capital paid Jenkens & Gilchrist to implement a

transaction that we have held lacks economic substance. Accordingly, petitioner is not entitled to a $500,000 deduction for legal fees paid to Jenkens & Gilchrist. See Winn-Dixie Stores, Inc. & Subs. v. Commissioner, supra at 294; Brown v. Commissioner, supra at 1000-1001.

VI. Penalties

Section 6662 imposes an accuracy-related penalty on certain underpayments of tax, and the amount of the penalty is computed as a percentage of the underpayment. The explanation of items attached to the notice imposed alternative section 6662 penalties, including penalties for a gross valuation misstatement, negligence, and a substantial understatement of income tax. Section 1.6662-2(c), Income Tax Regs., provides that only one accuracy-related penalty may be imposed with respect to any given portion of an underpayment, even if that portion is attributable to more than one of the types of conduct listed in section 6662(b). See also Jaroff v. Commissioner, T.C. Memo. 2004-276.

We will take each penalty in turn and determine whether the individual penalty applies to petitioner's underpayment. Should we determine that a penalty applies, we will then determine whether petitioner satisfies the reasonable cause exception in section 6664(c). Lastly, should we find that petitioner is liable for a penalty on one or more grounds, and that petitioner

did not satisfy the reasonable cause exception, we will apply the antistacking provisions to determine how each penalty applies to the different portions of the underpayment.

A.  Valuation Misstatement Penalty

Respondent argues that petitioner is liable for either a substantial or gross valuation penalty pursuant to section 6662(b)(3) and (e) or (h).  Section 6662(b)(3) imposes a 20-percent penalty on that portion of an underpayment which results from a substantial valuation misstatement.  There is a substantial valuation misstatement if the value of any property claimed on the return is 200 percent or more of the amount determined to be the correct amount.  Sec. 6662(e)(1)(A). Section 6662(h) increases the penalty to 40 percent in the case of a gross valuation misstatement.  There is a gross valuation misstatement if the value is 400 percent or more of the value determined to be the correct amount.  Sec. 6662(h)(2)(A)(i).

Respondent argues that the gross valuation misstatement penalty applies because petitioner reported an adjusted basis of $10,652,936 in the Cisco stock when the stock had a true basis of $148,474.  Accordingly, respondent contends petitioner's reported basis is more than 400 percent of the correct amount and the gross valuation misstatement penalty applies.

Petitioner argues that the gross valuation misstatement penalty does not apply as a matter of law because should we

disallow the claimed loss, a basis adjustment would not be required.  Petitioner argues that should we disallow the loss on the Cisco stock as a result of a finding that the BLISS transaction lacked economic substance, the underpayment of tax would stem from a lack of economic substance, not a valuation misstatement.  Petitioner points to Heasley v. Commissioner, 902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408, Gainer v. Commissioner, 893 F.2d 225 (9th Cir. 1990), affg. T.C. Memo. 1988-416, and Todd v. Commissioner, 89 T.C. 912 (1987), affd. 862 F.2d 540 (5th Cir. 1988), in support of this argument.  In Heasley, the Court of Appeals for the Fifth Circuit held that

> Whenever the I.R.S. totally disallows a deduction or credit, the I.R.S. may not penalize the taxpayer for a valuation overstatement included in that deduction or credit.  In such a case, the underpayment is not attributable to a valuation overstatement.  Instead, it is attributable to claiming an improper deduction or credit. * * * [Id. at 383.]

We begin by noting that Heasley is distinguishable.  In Heasley, the Court of Appeals reasoned that a valuation penalty should not apply where a deduction is disallowed in full because the amount of the taxpayer's liability does not depend on a misvaluation; the taxpayer's liability is based upon the disallowance of the entire deduction.  Id. at 383 ("In this case, the Heasleys' actual tax liability does not differ one cent from their tax liability with the valuation overstatement included. In other words, the Heasleys' valuation overstatement does not change the amount of tax actually owed.").  Petitioner had some

basis in the Cisco stock apart from the basis claimed as a result of entering into the BLISS transaction. Heasley does not apply because by disallowing overvalued basis we are not disallowing the entire deduction claimed as a result of the sale of the Cisco stock.

Respondent also points to Illes v. Commissioner, 982 F.2d 163 (6th Cir. 1992), and argues that the Court of Appeals for the Sixth Circuit does not follow the Heasley line of cases. In Illes v. Commissioner, supra at 167, the court held that a valuation misstatement penalty applies in situations in which an underpayment stems from disallowed deductions or credits due to lack of economic substance. In the instant proceeding, the deficiency resulted directly from the incorrect basis in the Cisco stock. New Phoenix reported a basis of $10,652,936 in the Cisco stock. The correct basis was $149,958. The reported basis is more than 400 percent of the correct basis, and the underpayment results directly from this overstatement. Accordingly, petitioner is liable for a 40-percent gross valuation misstatement penalty. See id.; see also Pasternak v. Commissioner, 990 F.2d 893, 903-904 (6th Cir. 1993), affg. Donahue v. Commissioner, T.C. Memo. 1991-181; cf. Keller v. Commissioner, 556 F.3d 1056 (9th Cir. 2009), affg. in part and revg. in part T.C. Memo. 2006-131.

B. <u>Substantial Understatement of Income Tax</u>

Respondent argues that petitioner is liable for the 20-percent accuracy-related penalty for a substantial understatement of income tax pursuant to section 6662(d). The 20-percent accuracy-related penalty will apply where the 40-percent gross valuation penalty does not. For corporate taxpayers, there is a substantial understatement of income tax if the understatement exceeds the greater of 10 percent of the tax required to be shown on the return or $10,000. Sec. 6662(d)(1); sec. 1.6662-4(b)(1), Income Tax Regs. Section 6662(d)(2)(B)(i), however, provides that the amount of an understatement is reduced for any item that is supported by substantial authority. Section 1.6662-4(d)(2), Income Tax Regs., provides that the substantial authority standard

> is an objective standard involving an analysis of the law and application of the law to relevant facts. The substantial authority standard is less stringent than the more likely than not standard (the standard that is met when there is a greater than 50-percent likelihood of the position being upheld), but more stringent than the reasonable basis standard as defined in § 1.6662-3(b)(3) [Income Tax Regs.]. * * *

Section 6662(d)(2)(C)(i) provides that the reduction for substantial authority does not apply to tax shelters. Section 6662(d)(2)(C)(ii) defines the term "tax shelter" as "a partnership or other entity, * * * any investment plan or arrangement, or * * * any other plan or arrangement, if a

significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax."

Respondent argues that New Phoenix was required to show a tax of $3,617,883 on its return. Because New Phoenix reported a tax of only $261,977, respondent contends New Phoenix understated its tax liability by $3,355,906, which exceeds both $10,000 and 10 percent of the tax required to be shown on the return.

Petitioner argues that it did not substantially understate its income tax because it had substantial authority for the position taken on its tax return. Respondent argues that petitioner should not be able to avail itself of the substantial authority safe harbor because (1) New Phoenix did not have substantial authority for its position, and (2) the transaction was a tax shelter. Respondent argues that the BLISS transaction, regardless of outcome, was guaranteed to provide Capital with a $10 million tax loss and tax avoidance was a significant purpose of the transaction.

We find that petitioner lacked substantial authority for the position taken on its return. Although petitioner claims to have relied on caselaw in taking the position that the sold short option was contingent and not required to be taken into account when calculating Capital's basis in Olentangy Partners, petitioner's advisers were aware of Government efforts to combat abusive tax shelters that called that conclusion into question.

Before New Phoenix filed its tax returns, Mr. Wray, Mr. Litt, and Mr. Daugerdas all knew that the Government was investigating transactions substantially similar to the transaction at issue. Mr. Litt voiced his concerns to Mr. Wray and spoke with Mr. Daugerdas on numerous occasions, specifically about section 6662 penalties and how similar the BLISS transaction was to those transactions described in Notice 2000-44, supra, and subsequent IRS releases. These releases cast doubt on any claimed reliance on Helmer v. Commissioner, T.C. Memo. 1975-160, and its progeny, and petitioner cannot claim to have had substantial authority for its return position. See Jade Trading, LLC v. United States, 80 Fed. Cl. at 58 ("At bottom, the fictional nature of the transaction and its lack of economic reality outweigh Helmer in the substantial authority assessment."); cf. Klamath Strategic Inv. Fund, L.L.C. v. United States, 440 F. Supp. 2d 608 (E.D. Tex. 2006).

Accordingly, petitioner substantially understated its income tax liability and is liable for a 20-percent accuracy-related penalty.

C. Negligence and Disregard of Rules

Lastly respondent argues that petitioner is liable for a 20-percent accuracy-related penalty for negligence and disregard of rules or regulations. Section 6662(c) provides that "the term 'negligence' includes any failure to make a reasonable attempt to

comply with the provisions of this title, and the term 'disregard' includes any careless, reckless, or intentional disregard." Section 1.6662-3(b)(1)(ii), Income Tax Regs., provides that negligence is strongly indicated where "a taxpayer fails to make a reasonable attempt to ascertain the correctness of a deduction, credit or exclusion on a return which would seem to a reasonable and prudent person to be 'too good to be true' under the circumstances."

Respondent argues that the tax benefits from the BLISS transaction were too good to be true, that petitioner was negligent, and that petitioner disregarded rules and regulations in its reporting of the transaction at issue. Respondent points to Mr. Wray's lack of investigation and argues that Mr. Wray failed to apply his financial background to the digital option spread. Respondent contends that Mr. Wray had the financial acumen to correctly evaluate the profit potential of the digital option spread and to properly value it. Respondent further contends that the disparity between the out-of-pocket costs of the BLISS transaction and the expected tax benefits would have alerted a reasonable and prudent person that the benefits were too good to be true. Respondent disputes Mr. Wray's testimony concerning his research and argues that any research Mr. Wray eventually did was only meant to serve as a pretext and was done after deciding to enter into the BLISS transaction.

Lastly respondent argues that petitioner acted negligently because at the time it reported the BLISS transaction, New Phoenix and its advisers were aware of the IRS investigation and position concerning transactions similar to the one at issue, yet relied on Jenkens & Gilchirst and improperly reported the BLISS transaction.

Petitioner argues that it was not negligent because at the time it entered into the transaction caselaw supported the position taken on its return.  Petitioner again points to Helmer v. Commissioner, supra, and other cases holding that assumption of a contingent liability by a partnership does not reduce a partner's basis in that partnership.

We agree with respondent.  At the time petitioner reported the BLISS transaction on its return, New Phoenix and its advisers knew that reliance on Helmer was misplaced.  New Phoenix filed its return well after the IRS issued Notice 2000-44, supra, was aware of recent developments in this area of tax law, and did not seek independent advice to guarantee proper reporting of the BLISS transaction.  See Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221, 234 (3d Cir. 2002) ("As highly educated professionals, the individual taxpayers should have recognized that it was not likely that by complex manipulation they could obtain large deductions for their corporations and tax free income for themselves."), affg. 115 T.C. 43 (2000).

Accordingly, the negligence penalty applies.  See Pasternak v. Commissioner, 990 F.2d at 903; Stobie Creek Invs., LLC v. United States, 82 Fed. Cl. at 721; Jade Trading, LLC v. United States, 82 Fed. Cl. at 57; Maguire Partners-Master Invs., LLC v. United States, 103 AFTR 2d at 778, 2009-1 USTC par. 50,215, at 87,450.

D.   Reasonable Cause and Good Faith

Separate from its arguments that it had substantial authority for its position and did not act negligently, petitioner argues that it acted with reasonable cause and in good faith in its reporting of the BLISS transaction because petitioner obtained a "written tax opinion from a nationally recognized and well respected law firm".  Section 6664(c)(1) provides that "No penalty shall be imposed under section 6662 * * * with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion."  If petitioner is able to show reasonable cause for the position taken on its return, the penalties discussed above will not apply.  The decision as to whether the taxpayer acted with reasonable cause and good faith depends upon all the facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  Relevant factors include the taxpayer's efforts to assess his proper tax liability, including the taxpayer's reasonable and good faith

reliance on the advice of a professional such as an accountant or attorney.

Petitioner draws support for its reasonable cause and good faith argument from United States v. Boyle, 469 U.S. 241, 251 (1985), in which the Supreme Court stated that "When an accountant or attorney advises a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice."

Respondent concedes that under Boyle taxpayers need not second-guess their independent, professional advisers, but argues that Jenkens & Gilchrist was not independent, but rather was a promoter of the BLISS transaction. Accordingly, respondent argues, it was not reasonable for petitioner to rely on an opinion written by Jenkens & Gilchrist. Respondent points to Pasternak v. Commissioner, supra, in support of his position. In Pasternak, the Court of Appeals for the Sixth Circuit rejected a taxpayer's argument that negligence penalties under section 6653 should not be imposed because the taxpayer relied "on the advice of 'financial advisors, industry experts, and professionals'". Id. at 903. The court stated that "the purported experts were either the promoters themselves or agents of the promoters. Advice of such persons can hardly be described as that of 'independent professionals.'" Id. In Mortensen v. Commissioner, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004-279, the

court further stated that "In order for reliance on professional tax advice to be reasonable * * * the advice must generally be from a competent and independent advisor unburdened with a conflict of interest and not from promoters of the investment."

We find petitioner's reliance on Jenkens & Gilchrist and the tax opinion to be unreasonable rather than reasonable.  Jenkens & Gilchrist actively participated in the development, structuring, promotion, sale, and implementation of the BLISS transaction. Petitioner was not reasonable in relying on the tax opinion in the face of such a conflict of interest.  See Neonatology Associates, P.A. v. Commissioner, supra at 234; Pasternak v. Commissioner, supra at 903; Illes v. Commissioner, 982 F.2d at 166; Maquire Partners-Master Invs., LLC v. United States, supra at 778, 2009-1 USTC par. 50,215, at 87,450 ("Furthermore, the partnerships have failed to demonstrate that they * * * sought and received disinterested and objective tax advice because the tax advice that they did receive came from Arthur Andersen, which also arranged the transactions resulting in the increased basis that is at issue in this case."); Stobie Creek Invs., LLC v. United States, supra at 715 ("The evidence nonetheless unequivocally establishes that both J & G and SLK were tainted by conflict-of-interest.").

As discussed above, Mr. Litt had concerns about the reporting of the BLISS transaction.  Mr. Litt informed Mr. Wray

of these concerns and had numerous discussions with Mr. Daugerdas centered on the applicability of section 6662 penalties and recent IRS developments.  Mr. Litt also sent Mr. Wray copies of tax publication articles detailing the Treasury Department and the IRS' actions concerning alleged abusive tax shelters.  See Maquire Partners-Master Invs., LLC v. United States, supra at 778, 2009-1 USTC par. 50,215, at 87,450.

These documents show that at the time New Phoenix and its advisers were considering the proper reporting of the transaction, Mr. Litt and Mr. Wray were aware that the Government was investigating transactions similar to the transaction at issue.  These concerns should have put New Phoenix on notice that the reporting of the BLISS transaction as recommended by Jenkens & Gilchrist was unacceptable.  Petitioner should have also known that Jenkens & Gilchrist had a personal stake in the BLISS transaction and could not be relied upon to provide independent advice.  That petitioner's independent advisers had significant questions about the BLISS transaction should have caused Mr. Wray to question Jenkens & Gilchrist's assurances that the transaction was reported properly.  These factors should have put petitioner on notice that reliance on Jenkens & Gilchrist was unreasonable and that petitioner would have to consult with independent counsel in order to determine the propriety of New Phoenix's reporting.  See Pasternak v. Commissioner, 990 F.2d at 903; Illes

v. Commissioner, supra at 166; see also Watson v. Commissioner, T.C. Memo. 2008-276; Ghose v. Commissioner, T.C. Memo. 2008-80. It was unreasonable for petitioner and Mr. Wray to rely on Jenkens & Gilchrist in view of the surrounding facts.

In summary, Jenkens & Gilchrist's conflict of interest and petitioner's knowledge of recent developments in tax law should have convinced petitioner of the need for further investigation into the proper reporting of the BLISS transaction.  Petitioner claimed a fictional loss of nearly $11 million.  This is exactly the type of "too good to be true" transaction that should cause taxpayers to seek out competent advice from independent advisers. See Neonatology Associates, P.A. v. Commissioner, 299 F.3d at 234 ("When, as here, a taxpayer is presented with what would appear to be a fabulous opportunity to avoid tax obligations, he should recognize that he proceeds at his own peril."); Stobie Creek Invs., LLC v. United States, supra at 716 (relying on Neonatology Associates, P.A., holding that the Jenkens & Gilchrist strategy is the type that should appear to be too good to be true). Petitioner's decision to rely exclusively on Jenkens & Gilchrist in reporting the BLISS transaction was therefore not reasonable. Petitioner did not have reasonable cause for its position and did not take that position in good faith.  Accordingly, petitioner remains liable for the section 6662 penalties.

E.  Conclusion

Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion is characterized by more than one of the types of conduct described in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.  As discussed above, petitioner is liable for an accuracy-related penalty because of a gross valuation misstatement, a substantial understatement of income tax, and negligence.  Section 1.6662-2(c), Income Tax Regs., prevents the Commissioner from stacking these amounts to impose a penalty greater than the maximum penalty of 20 percent on any given portion of an underpayment (or 40 percent if such portion is attributable to a gross valuation misstatement).  See Jaroff v. Commissioner, T.C. Memo. 2004-276.

Accordingly, petitioner is liable for the 40-percent accuracy-related penalty on that portion of the underpayment stemming from its overvaluation of the Cisco stock, and a 20-percent accuracy-related penalty on the remainder of the underpayment stemming from the disallowed flowthrough loss from Olentangy Partners and from the disallowed deduction for payments made to Jenkens & Gilchrist.

VII.  <u>Conclusion</u>

Respondent's determinations in the notice are upheld, and petitioner is liable for the section 6662 accuracy-related penalty.

Accordingly,

<u>Decision will be entered</u>

<u>for respondent</u>.