T.C. Memo. 2015-223

UNITED STATES TAX COURT

AD INVESTMENT 2000 FUND LLC, COMMUNITY MEDIA, INC., A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

AD GLOBAL 2000 FUND LLC, WARSAW TELEVISION CABLE CORP., A PARTNER OTHER THAN THE TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9177-08, 9178-08.          Filed November 19, 2015.

Certain corporations (Cs) simultaneously entered economically offsetting long and short options and subsequently contributed the option spreads to one of two LLCs, ADI or ADG. In less than a year, Cs disposed of their LLC interests and claimed huge tax losses from their investments on the theory that their partnership bases in their LLC interests equaled the cost of the long-option premium not reduced by the offsetting short-option premium received.

Held: ADI and ADG are tax-ignored entities for Federal tax purposes; R's adjustments are sustained; further proceedings will be necessary to determine the treatment of reported items.

Held, further, ADI's investment interest expense is not disallowed.

[*2]    <u>Held</u>, <u>further</u>, the accuracy-related penalty under I.R.C. sec. 6662 applies to the extent determinable in this entity-level proceeding.

<u>Howard Kleinhendler</u>, <u>Elliot Silverman</u>, <u>Orrin Tilevitz</u>, and <u>William B. Wachtel</u>, for petitioners.

<u>Elaine Harris</u>, <u>Kathryn F. Patterson</u>, <u>Jarrod R. Jenkins</u>, <u>Mark E. O'Leary</u>, and <u>Veronica L. Trevino</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, <u>Judge</u>:  These consolidated cases are before the Court for review of two notices of final partnership administrative adjustment (FPAAs). The limited liability companies, AD Investment 2000 Fund LLC (ADI) and AD Global 2000 Fund LLC (ADG) (collectively, LLCs), and their related transactions are what respondent describes as Son-of-BOSS tax shelters.  For 2000, both ADI and ADG filed Forms 1065, U.S. Return of Partnership Income, the former reporting a net gain from certain option transactions and the latter reporting a net loss from similar transactions.  Respondent examined those returns, reversing the reported gains and losses and adjusting other items, including "outside partnership

**[\*3]** basis", to zero. He also determined in each case to apply an accuracy-related penalty. Petitioners assign error to respondent's adjustments and to his penalty determinations.

These cases are among the latest in a long line involving a particular tax shelter variant, where a taxpayer uses offsetting options in an attempt to get an artificially high basis in a partnership interest and then claim a significant tax loss from the disposition of that interest. See Sala v. United States, 613 F.3d 1249 (10th Cir. 2010); Stobie Creek Invs. LLC v. United States, 608 F.3d 1366 (Fed. Cir. 2010); Jade Trading, LLC v. United States, 598 F.3d 1372 (Fed. Cir. 2010); New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161 (2009), aff'd, 408 F. App'x 908 (6th Cir. 2010); 436, Ltd. v. Commissioner, T.C. Memo. 2015-28; Markell Co. v. Commissioner, T.C. Memo. 2014-86; Humboldt Shelby Holding Corp. v. Commissioner, T.C. Memo. 2014-47, aff'd per summary order, 606 F. App'x 20 (2d Cir. 2015); 6611, Ltd. v. Commissioner, T.C. Memo. 2013-49; Palm Canyon X Invs., LLC v. Commissioner, T.C. Memo. 2009-288, 2009 WL 4824326; Candyce Martin 1999 Irrevocable Tr. v. United States, 822 F. Supp. 2d 968 (N.D. Cal. 2011), aff'd in part, rev'd in part, 739 F.3d 1204 (9th Cir. 2014); Fid. Int'l Currency Advisor A Fund, LLC v. United States, 747 F. Supp. 2d 49 (D. Mass. 2010), aff'd, 661 F.3d 667 (1st Cir. 2011); Maguire Partners-Master Invs.,

[*4] <u>LLC v. United States</u>, 104 A.F.T.R.2d (RIA) 2009-7839 (C.D. Cal. 2009), 2009 WL 4907033, <u>aff'd sub nom.</u> <u>Thomas Inv. Partners, Ltd. v. United States</u>, 444 F. App'x 190 (9th Cir. 2011); <u>Cemco Invs., LLC v. United States</u>, 99 A.F.T.R.2d (RIA) 2007-1882 (N.D. Ill. 2007), 2007 WL 951944, <u>aff'd</u>, 515 F.3d 749 (7th Cir. 2008).

Such losses have consistently been disallowed, and nothing about these cases warrants a different result. Primarily because we find that the LLCs should not be recognized as entities for Federal tax purposes, we will sustain respondent's adjustments and, to the limited extent that we can do so in this entity-level proceeding, his penalty determinations. We will inquire of the parties how, since we disregard the LLCs as tax-recognized entities, they believe we should treat the items reported by the LLCs.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 2000.

FINDINGS OF FACT

James Haber and DGI

James Haber is the architect behind the LLCs and the transactions at issue. Mr. Haber is a sophisticated tax professional who, from 1978 until 2003, was engaged in the business of providing income tax planning services. In 1992, he

[*5] founded the Diversified Group, Inc. (DGI) to execute his tax-structured transactions, and, in 2000, he was the sole director, chief executive officer, and president of DGI. Mr. Haber also employed Alpha Consultants LLC (Alpha), formed to consult in his execution of various transactions.

Before and during 2000, DGI marketed the tax avoidance strategy at issue in these cases. DGI called that strategy the foreign currencies (FX) investment strategy (FXIS). FXIS is described in marketing materials prepared by DGI in 1999. Those materials are marked "confidential", and FXIS is described as a proprietary strategy of DGI and Alpha. The strategy involves the purchase and subsequent contribution of one or more option spreads to an entity purportedly classified as a partnership for Federal tax purposes. The marketing material describes the tax benefit to an investor in the strategy as "a permanent taxable loss in excess of its gain or loss for accounting purposes." It describes DGI as having been involved "in over 30 finance and/or acquisition-related strategies in over the last two years alone." It describes Alpha's principals as hedge fund managers having collectively over 50 years of trading experience.

In 2000, Bruce Brier was employed as a tax lawyer by Lehman Brothers Commercial Corp. (Lehman). In 2000, Mr. Haber spoke with him and several others at Lehman about FXIS. He presented to Mr. Brier the DGI marketing

**[*6]** materials. He wanted Lehman to act as the execution party for option transactions that DGI would bring to it.

The Corporations

Mr. Haber, through various intermediaries, gained control of six different corporations: North American Communications Corp., Warsaw Television Cable Corp. (WTC), Echelon International Corp. (EIC), Community Media, Inc., Warner Enterprises, Inc., and Branch Book, Inc. (collectively, corporations). The corporations all had in common low-basis assets with substantial built-in gains. Mr. Haber caused the corporations to sell their assets, giving rise to recognized gains. For instance, WTC reported on its 2000 Form 1120, U.S. Corporation Income Tax Return (WTC Form 1120), a gain of $1,833,384 from the sale of its business. To eliminate the resulting tax liability triggered by the recognized gains, Mr. Haber caused each corporation to engage in FXIS.

The Option Spreads

The option spreads at issue here involve the simultaneous purchase and sale of European-style digital foreign currency options.[1] Each corporation entered into

---

[1]Foreign currency options are always both a "call" option and a "put" option, because the holder is getting the right to simultaneously buy one currency and sell another. European-style options can be exercised only at the option contract's expiration. Digital options are cash-or-nothing options, and so the

(continued...)

[*7] one of them, except for EIC, which entered into two, and the mechanics can be illustrated by the following actual transaction.

WTC entered into what could be called an EURUSD digital option spread.[2] At a moment when the EURUSD exchange rate was 0.9705, WTC "paid" Lehman $2,500,000 for the right to receive 6,478,604 EUR (~$6,435,198) if, 74 days in the future, the EURUSD exchange rate was at or above 0.9933 (the purchase of a "long option"). It simultaneously "received" from Lehman $2,450,000 for the obligation to pay 6,374,967 EUR (~$6,332,892) if, 74 days in the future, the EURUSD rate was at or above 0.9934 (the sale of a "short option"). The "paid" and "received" are in quotation marks because, economically speaking, WTC actually paid Lehman only $50,000 (the net of $2,500,000 and $2,450,000) for the option spread. That option spread had the following possible outcomes: receipt of nothing if the exchange rate was below 0.9933, receipt of 6,478,604 EUR if the exchange rate was exactly 0.9933, or receipt of a net gain of 103,637 EUR

---

[1](...continued)
potential payout is known at the onset of the contract and is not dependent on the degree to which the foreign currency exchange moves.

[2]Specifically, WTC purchased from Lehman a long option to buy euro and to sell U.S. dollars, and simultaneously sold to Lehman an almost identical short option. The EURUSD nomenclature means a call on euro and a put on U.S. dollars. It also means the exchange rate is quoted in U.S. dollars.

**[*8]** (~$102,305) if the rate was at or above 0.9934 (when the exchange rate is such that a payout is necessary, the options are said to be "in the money").

The option spreads of the corporations were similar in the following senses: The contract durations of the long and short options were identical (74 days in the example) and were always for less than 121 days; the strike prices (0.9933 and 0.9934) were extremely close together such that the theoretical probability of the large payout on the "sweet spot" (0.9933) was extremely low;[3] Lehman was always both the counterparty and the calculation agent;[4] and the net economic cash outlay ($50,000) was nominal relative to the premium of the long options ($2,500,000).

---

[3]All of the strike prices were only one "pip" apart. A pip is the smallest price increment that the price of the underlying asset can move. For example, for EURUSD, one pip is $0.0001.

[4]By "counterparty", we mean Lehman bought the options that the corporations sold (it would receive payouts from the corporations if the options expired in the money) and sold the options that the corporations bought (it would have to make payouts to the corporations if the options expired in the money). By "calculation agent", we mean someone at Lehman was responsible for determining the exchange rate price when the options expired. So, in essence, Lehman was responsible for making the payout if necessary and determining whether it was necessary.

**[\*9]** <u>The LLCs</u>

Mr. Haber formed ADI and ADG as Delaware LLCs in February 2000, with DGI and Alpha as founding members of both. Both DGI and Alpha contributed cash for their membership interests. DGI and Alpha were comanagers of ADG and ADI, although Alpha did not exercise independent authority but merely performed services at Mr. Haber's direction in exchange for a share of each LLC's profits. Through his status with DGI, Mr. Haber was the de facto manager of, and controlled, both LLCs. The operating agreements of the LLCs are nearly identical, stating that, among other things, each was formed to trade in U.S. and foreign currencies and futures contracts relating to currencies.

<u>Implementing FXIS</u>

Once Mr. Haber had de facto control over all parties involved (the LLCs and the corporations), he could implement FXIS, the important aspects of which were detailed in the marketing materials he had prepared. After creating the LLCs, he had them each engage in two of their own option spread transactions using the cash contributed by DGI and Alpha. Those option spreads differed from those entered into by the corporations only in that, when the LLCs entered into them, the options were already very deep in the money. That meant that the ultimate net payouts were virtually guaranteed (and indeed were made upon option

[*10] expiration).  The transactions were so deep in the money that they had the characteristics of cash deposits with Lehman.  But, given the prevailing bank deposit interest rates at the time, the LLCs would, with less risk, have made more money had they just deposited the cash in interest-bearing bank accounts.

As noted supra, the corporations each purchased an option spread (or in EIC's case, two option spreads) similar to that purchased by WTC in the illustrative transaction.  Then, each corporation contributed its option spread to either ADG or ADI in exchange for a membership interest.  Only one of those option spreads expired in the money.  Before the tax year drew to a close, each corporation either sold its interest in its respective LLC or resigned as a member and received a liquidating distribution.  WTC, for example, sold a portion of its interest in ADG for $23,200 and then later received a liquidating distribution of euro, which it sold for $4,021.  On the WTC Form 1120, instead of reporting what appears to be an economic loss of approximately $22,779 ($50,000 investment less the $27,221 received) resulting from its closing out its option-related transactions with ADG, WTC reported losses totaling $2,460,133, which was more than sufficient to shelter the $1,833,384 of gain that it reported from the sale of its business.

[*11] WTC's large claimed losses of $2,460,133 result from its computation of its tax basis in its membership interest in ADG. When an entity is classified as a partnership for tax purposes, a partner's basis in his interest in the entity acquired by a contribution of property, including money, to the entity is generally the sum of the money contributed to the entity plus the adjusted basis of the property contributed to the entity. See sec. 722. A decrease in a partner's individual liabilities on account of the partnership's assumption of them is considered a distribution of money by the entity to the partner, sec. 752(b), which reduces his adjusted basis in his interest in the entity by the amount of the deemed distribution, see sec. 733. When WTC contributed the option spread to ADG, it took the position that its basis in its ADG interest was equal to the cost of the long option it contributed ($2,500,000). WTC (and the other corporations) disregarded the short-option liability on the theory that it was "too contingent" to count, and thus did not give rise to a basis-decreasing deemed distribution of money despite the fact that WTC actually spent only $50,000 for the option pair. WTC's $2,500,000 claimed basis did not reconcile with its $50,000 investment, and that is what accounts for WTC's large claimed losses from its investment in ADG.

Mr. Haber obtained a tax opinion from the law firm Brown & Wood for each corporation. The opinions bless the corporations' decisions to compute tax

[*12] bases in the LLCs by the costs of the long options without any reduction for the liabilities represented by the short options. The opinions, however, rest on a number of questionable representations by Mr. Haber, namely that the corporations entered into the option spreads for substantial nontax business reasons and that the corporations contributed the option spreads to the LLCs for substantial nontax business reasons. Mr. Haber also represented for purposes of the opinions that purchasing and contributing the option spreads and then resigning from the LLCs were not part of a prearranged plan and that the corporations and the LLCs were in no way related: both false representations.

The Internal Revenue Service (IRS) identified the essential elements of FXIS as a type of abusive tax shelter, and it warned taxpayers of its illegitimacy when, in August 2000, it issued Notice 2000-44, 2000-2 C.B. 255. It warned that purported losses from transactions implementing the strategy "do not represent bona fide losses reflecting actual economic consequences as required for purposes of § 165." With clear reference to elements of FXIS, it warned that losses from "arrangements designed to produce noneconomic tax losses by artificially overstating basis in partnership interests[] are not allowable as deductions for federal income tax purposes." It added: "Appropriate penalties may be imposed on participants in these transactions".

[*13] Like WTC, the other corporations reported income for 2000 on Forms 1120. On account of FXIS, each reported no 2000 tax liability. On its 2000 Form 1065, ADG reported no activity other than the option spread transactions, resulting in a claimed loss of $704,768. On its 2000 Form 1065, ADI also reported the option spread transactions, but it reported that those transactions resulted in a net gain of $161,744. ADI also reported a $772 investment interest expense deduction. Both Forms 1065 were filed with the IRS no earlier than November 5, 2001.

FPAAs

In November 2007, respondent issued to the tax matters partner of each of the LLCs an FPAA in which he made his adjustments and his accuracy-related penalty determinations. He reversed both the $704,768 loss reported by ADG and the $161,744 gain reported by ADI. He made other adjustments, principally to reported partnership contributions and distributions, that were reflective of his disregard of the LLCs as entities classified as partnerships for Federal income tax purposes. He adjusted to zero the LLCs' members' claimed outside bases. By way of explanation, he stated, among other things, that the LLCs had been "formed and availed of solely for purposes of tax avoidance by artificially overstating basis in the partnership interests of its purported partners." Because the transactions and partnership had "no business purpose other than tax avoidance," they "lacked

**[\*14]** economic substance", and so respondent would disregard them for tax purposes and disallow the related losses. He reduced to zero the $772 interest deduction claimed by ADI on the ground that it had not been substantiated or, if substantiated, shown to be deductible.

Petitions and Trial

Petitioners timely challenged the FPAAs. In the petitions, petitioners claimed the LLCs' principal place of business to be in New York. Trial in these cases was held in New York, New York, in June 2014. Before trial, we excused Mr. Haber from testifying on the basis of his constitutional claim of privilege against self-incrimination. Testimony at trial consisted principally of expert testimony concerning the economics of the option spreads. We summarize the important aspects of that testimony and some of the findings we make on the basis of that testimony.

Sweet Spot

We find that the option spreads at issue here would never have expired on the "sweet spot" (the exchange rate at which the long option is in the money, but the short option is not). All experts agreed that the probability of such an event's even theoretically occurring was extremely small. Thomas P. Murphy, one of respondent's experts, testified that Lehman, as the calculation agent, had discretion

[*15] to pick from a range of prices wider than the sweet spot.[5]  He testified that it would always be commercially reasonable for Lehman to pick a price outside of the sweet spot, and it would be in their financial best interest, as the counterparty to the transaction, to do so.  In the trade confirmations, the parties (Lehman and the corporations) agree that neither party owes a fiduciary duty to the other.  The trade confirmations specify that Lehman is to pick a price in good faith and in a commercially reasonable manner, and Mr. Murphy has convinced us that Lehman could have done that while ensuring the sweet spot was never hit.

Scott D. Hakala, Ph.D., petitioners' expert, insisted that Lehman did not have discretion to pick the price, and he pointed to sections of the International Swaps and Derivatives Association, Inc. (ISDA) master agreement and supplemental documents published by the ISDA as support.  Mr. Murphy testified that in 2000, FX traders acting as calculation agents did not refer to the ISDA documents when picking prices.  He further testified that some of the portions of the ISDA agreement referred to by Dr. Hakala did not apply to the option transactions in these cases.  Dr. Hakala insisted that the ISDA documents are

[5]More specifically, he credibly testified that the market spread on exchange rates was three pips wide, and calculation agents such as Lehman would have discretion to pick a price at least within that range.  Because the sweet spot for all of the option spreads was only one pip wide, it, in effect, gave Lehman discretion to always pick a price outside of the sweet spot.

[*16] "unambiguous" in dictating how a calculation agent is to select the price. We disagree. Dr. Hakala pointed us to portions of the ISDA agreement that do not appear to apply here,[6] and we do not find him credible with respect to his opinion regarding Lehman's discretion as calculation agent to pick a price to close out a transaction. Moreover, in response to a question from the Court, Dr. Hakala conceded that, as a practical matter, the option spread would never actually expire on the sweet spot. He added that he had never seen it happen and that, if the option spread was close to being or in the money, the parties would close it out before expiration at an agreed price.

Investment and Diversification Purpose

The corporations knew or should have known that hitting the sweet spot was not going to happen. Also, Mr. Murphy has convinced us that the option pairs

---

[6]Dr. Hakala referred us to a section that applies if the trade confirmations specify the use of "Currency-Reference Dealers". The trade confirmations here make no such reference. He also pointed us to a definition of "Market Quotation" that applies more or less in situations of breached contracts and would not appear applicable, especially at the time of contract execution. The ISDA documents appear to provide considerable flexibility, depending on the terms in a trade confirmation. The trade confirmations here place no requirements on the calculation agent other than that it pick a price in good faith and in a commercially reasonable manner. Dr. Hakala has not pointed us to any portions of the ISDA documents that provide guidance on the "good faith and commercially reasonable" standard, and we have found none. Mr. Murphy credibly testified to bank practices in 2000, and Dr. Hakala has not convinced us that the ISDA documents are inconsistent with those practices.

[*17] acquired by the corporations were not particularly good investments. He testified that, if the corporations' objectives were to invest in foreign currency European digital options, there were alternatives, not involving paired options with a not-to-be-obtained sweet spot, with higher likelihoods of success. For example, WTC's option spread was a bet that the euro would increase in value relative to the U.S. dollar. It spent $50,000 for a maximum payout of ~$102,305, and, in order to receive that, the EURUSD exchange rate had to go from 0.9705 to 0.9933 or higher (at least a 228-pip increase) in 74 days. Mr. Murphy testified that, if WTC's investment objective was to spend a net premium of $50,000 for a maximum payout of ~$102,305 based on the EURUSD's going up in price, there was a simpler single option that had a higher probability of achieving that objective. It could have purchased a single EURUSD European digital call for a $50,000 premium that had a payout of $102,305 with a strike price of 0.9722, just 17 pips above the exchange rate price at the time WTC entered into its EURUSD option spread. The probability that the EURUSD rate would increase at least 17 pips (to put that option in the money) was considerably greater than the probability of its increasing at least 228 pips.

Dr. Hakala, petitioners' expert, did not explain why the corporations entered into more complicated transactions when simpler ones with higher probabilities of

**[*18]** profit were available, even opining that he did not see anything that suggested an "intent of really beating the market at [a] sophisticated level". When asked whether he thought the purpose of the option spreads was actually to profit from foreign currency markets in view of the fact that the purported tax benefits made profiting immaterial, he stated: "I understand that to some extent, as I would say, the tail wagged the dog".

John D. Finnerty, the second of respondent's experts, also credibly testified that neither the option spreads nor their contribution to the LLCs provided the corporations with any additional risk diversification, hedging, or profit potential when compared to purchasing a single long option and holding the option outside of the LLC. In essence, he testified, and we find, that FXIS was complex and unnecessary. Any actual diversification achieved was minimal, and it could have easily been achieved without an LLC. He testified, and we find, that the yen, the euro, and the Canadian dollar are "obtained and traded with ease by lay investors without the need for third-party investment management."

LLCs' Posttransaction History

The LLCs stopped paying State franchise tax to Delaware in 2002. Both lost their entity status in Delaware in 2005. Neither LLC filed income tax returns

[*19] for 2003 through 2009. Both LLCs filed certificates of revival with the State of Delaware in 2014.

OPINION

I.    Preliminary Matters

   A.    Jurisdiction To Review FPAAs

   Section 6226 gives us jurisdiction to review the FPAAs. Pursuant to section 6226(f), we may determine partnership items, allocate partnership items among the partners, and determine the applicability of penalties, additions to tax, and other amounts relating to our adjustments to partnership items. Section 6231(a)(3) defines partnership item: "The term 'partnership item' means, with respect to a partnership, any item required to be taken into account for the partnership's taxable year under any provision of subtitle A to the extent regulations prescribed by the Secretary provide that, for purposes of this subtitle, such item is more appropriately determined at the partnership level than at the partner level." Section 301.6231(a)(3)-1(a)(1), Proced. & Admin. Regs., provides that partnership items include the partnership aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership. Partnership items also include "the legal and factual determinations that underlie the determination of the amount, timing, and characterization of items of income, credit, gain, loss,

[*20] deduction, etc." Id. para. (b). We may, thus, determine that, for Federal tax purposes, an entity does not exist or is not properly classified as a partnership, despite its filing of a partnership return. See Tigers Eye Trading, LLC v. Commissioner, 138 T.C. 67, 98-99 (2012) (citing Petaluma FX Partners, LLC v. Commissioner, 591 F.3d 649, 653-654 (D.C. Cir. 2010), aff'g in part, rev'g in part, vacating and remanding in part 131 T.C. 84 (2008)), aff'd in part, rev'd in part, and remanded sub nom. Logan Tr. v. Commissioner, 616 F. App'x 426 (D.C. Cir. 2015). Moreover, even if we determine that no entity exists, we treat the partnership return as if it were filed by an entity and have jurisdiction to determine the items that would be partnership items, as defined in section 6231(a)(3) and section 301.6231(a)(3)-1, Proced. & Admin. Regs., had an entity filed the return. See sec. 6233(b); sec. 301.6233-1(d), Proced. & Admin. Regs.; sec. 301.6233-1T(a), (c)(1), Temporary Proced. & Admin. Regs., 52 Fed. Reg. 6795 (Mar. 5, 1987).

B.    Burden of Proof

Rule 142(a)(1), Tax Court Rules of Practice and Procedure, provides:  "The burden of proof shall be upon the petitioner, except as otherwise provided by statute or determined by the Court".  Before trial, petitioners moved to shift the burden of proof to respondent given the apparent prejudice to petitioners after Mr.

[*21] Haber's decision not to testify. Petitioners represented that his testimony was vital to petitioners' carrying their burden as Mr. Haber played a central role in the LLCs and the transactions. We granted the motion by an order dated September 19, 2013, which sets forth our reasons for doing so, based on the reluctance, without explanation, of the U.S. Attorney's Office for the Southern District of New York, to ease Mr. Haber's fear of prosecution with respect to activities related to these cases. After trial, however, it was apparent that the resolution of the primary issue, i.e., whether to respect the LLCs as tax entities, did not depend on which party bore the burden of proof, and our findings on that issue have been based on the preponderance of the evidence. E.g., Kean v. Commissioner, 91 T.C. 575, 601 n.40 (1988); see also Knudsen v. Commissioner, 131 T.C. 185, 189 (2008) ("In a case where the standard of proof is preponderance of the evidence and the preponderance of the evidence favors one party, we may decide the case on the weight of the evidence and not on an allocation of the burden of proof.").

Respondent asks that we draw inferences adverse to petitioners from Mr. Haber's invocation of his constitutional right to remain silent. In a case involving Mr. Haber with very similar facts, the Court did draw adverse inferences about the entity based on Mr. Haber's decision not to testify, but we do not find it necessary

[*22] to make that determination. Cf. Markell Co. v. Commissioner, at *23.

There is sufficient objective evidence of intent in the record to support the

conclusions laid out infra.

C.     Principal Place of Business and Venue on Appeal

In our review of an FPAA, a partnership's or deemed partnership's principal

place of business at the time the petition is filed can determine the venue should a

party decide to appeal.  Sec. 7482(b)(1)(E).  While a trial court does not ordinarily

opine on the appellate venue of its decisions, see, e.g., Peat Oil & Gas Assocs. v.

Commissioner, T.C. Memo. 1993-130, 1993 WL 95592, at *7, this Court

"follow[s] a Court of Appeals decision which is squarely in point where appeal

from our decision lies to that Court of Appeals and to that court alone", Golsen v.

Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

And so if appellate venue determines how we apply the law, we consider the issue.

See Peat Oil & Gas Assocs. v. Commissioner, 1993 WL 95592, at *7.  The

doctrine we announced in Golsen, however, is narrow in that it is to be applied

only where, otherwise, "a reversal would appear inevitable".  Tigers Eye Trading,

LLC v. Commissioner, 138 T.C. at 144 (Halpern, J., concurring).

Petitioners argue that, on the basis of LLCs' principal place of business in

New York, the Court of Appeals for the Second Circuit is the proper appellate

[*23] venue and that, therefore, we are bound to follow that court's enunciation of the economic substance doctrine. Respondent, on the other hand, maintains that, because the LLCs had no principal place of business when the petitions were filed, the appropriate appellate venue is the Court of Appeals for the D.C. Circuit. See sec. 7482(b)(1) (flush language at conclusion).

We are not convinced that appellate venue is determinative in the resolution of these cases, nor is it clear that the Court of Appeals for the Second Circuit's economic substance jurisprudence differs substantively from the Court of Appeals for the D.C. Circuit's. Compare United States v. Coplan, 703 F.3d 46, 91-92 (2d Cir. 2012) (noting that the law of economic substance is "not a model of clarity" and has been inconsistently applied within the Circuit, but finding a lack thereof on the ground that a transaction lacks economic substance if it cannot with reason be said to have a purpose, substance, or utility apart from its anticipated tax consequences), and Gilman v. Commissioner, 933 F.2d 143, 148 (2d Cir. 1991) ("The Tax Court applied the sham analysis consistent with the guidelines of this Circuit and others, indicating the flexible nature of the analysis."), aff'g T.C. Memo. 1989-684, with ASA Investerings P'ship v. Commissioner, 201 F.3d 505, 512 (D.C. Cir. 2000) ("[T]he absence of a nontax business purpose is fatal."), aff'g T.C. Memo. 1998-305. We, therefore, find it unnecessary to determine whether

[*24] the LLCs had a principal place of business at the time the petitions were filed or to opine on appellate venue.  See CNT Investors, LLC v. Commissioner, 144 T.C. 161, 185 (2015) ("For us to undertake to resolve the correct appellate venue, inasmuch as it would not affect the disposition of this case, 'would, at best, amount to rendering an advisory opinion.  This we decline to do.'" (quoting Greene-Thapedi v. Commissioner, 126 T.C. 1, 13 (2006))).

II.     Whether the LLCs Are To Be Recognized as Entities for Federal Tax Purposes

        A.     Introduction

        Respondent would not, for tax purposes, recognize the LLCs as entities separate from their members.  That would eliminate any question of outside basis in a partnership.  See Tigers Eye Trading, LLC v. Commissioner, 138 T.C. at 127 ("Tigers Eye is a sham and is not treated as a partnership for Federal income tax purposes.  * * *  Consequently it follows with absolute certainty that there was no outside basis in the partnership."); see also Logan Tr. v. Commissioner, 616 F. App'x at 429 ("[If the partnership is a mere tax shelter], the partnership never existed, and no partner could have any outside basis in the entity.").  It is true that the LLCs were organized as LLCs under Delaware law.  Nevertheless, section 301.7701-1(a)(1), Proced. & Admin. Regs., provides:  "Whether an organization is

**[*25]** an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law." The regulations provide limited but important guidance on the definition of the term "entity". Section 301.7701-1(a)(2), Proced. & Admin. Regs., provides: "A joint venture or other contractual arrangement may create a separate entity for federal tax purposes if the participants carry on a trade, business, financial operation, or venture and divide the profits therefrom." Beyond the regulation, guidance is less clear, since important cases dealing with the nature of entities recognized as separate from their owners for Federal tax purposes, e.g., Commissioner v. Culbertson, 337 U.S. 733 (1949) (substance standard for partnerships); Commissioner v. Tower, 327 U.S. 280 (1946) (similar); Moline Props., Inc. v. Commissioner, 319 U.S. 436 (1943) (substance standard for corporate entities), predate the check-a-box regulations, sections 301.7701-1 through 301.7701-4, Proced. & Admin. Regs., which may place the question of whether there is a tax-recognized entity ahead of the classification of the entity as a partnership or corporation for tax purposes, see sec. 301.7701-3(a), Proced. & Admin. Regs.; see also 1 William S. McKee, et al., Federal Taxation of Partnerships and Partners, para. 3.03, at 3-29, S3-12 (4th ed. 2007 & Supp. III 2015) (subchapter entitled "Defining 'Business Entities': The Substance Tests").

**[*26]** Whatever difficulty there may be in precisely identifying what activities give an entity substance for tax purposes, activities whose sole purpose is tax avoidance--and which are dependent on the existence of an entity to accomplish that purpose--will not give substance to an entity formed or availed of to achieve that purpose. See, e.g., ASA Investerings P'ship v. Commissioner, 201 F.3d at 512; Commissioner v. Smith, 136 F.2d 556, 558-559 (2d Cir. 1943), rev'g 42 B.T.A. 505 (1940); 436, Ltd. v. Commissioner, at *34; cf. Knetsch v. Commissioner, 364 U.S. 361, 366 (1960) (rejecting taxpayer's annuity arrangements with insurance company as giving rise to indebtedness and, thus, interest deductions, since "it is patent that there was nothing of substance to be realized by Knetsch from this transaction beyond a tax deduction", and finding arrangements "a sham").

    B.    Parties' Arguments

        1.    Petitioners' Arguments

Petitioners argue that the LLCs meet the test for partnership recognition established by Commissioner v. Culbertson, 337 U.S. at 742. On brief, they argue that the following facts are a sufficient basis for the LLCs to be recognized as partnerships: "The members of each Petitioner [sic LLC] contributed property to it; those assets were pooled; profits and losses were shared in proportion to the

[*27] members' capital accounts; and, when each member resigned, it received its proportionate share of the fair market value of that Petitioner's [sic LLC's] assets."

Petitioners further argue that the LLCs should not be disregarded as partnerships on the ground that the transactions lacked "economic substance" or "business purpose".  In support they advocate that we analyze the transactions under a disjunctive two-prong test, in which we must respect the LLCs if we find that they had either a business purpose or a reasonable possibility of profit, apart from expected tax benefits.  And while advocating a disjunctive test, petitioners argue they meet both prongs.  For the first prong, petitioners concede that the transactions were tax motivated but argue that there was also a desire to make a profit and that is sufficient to satisfy the prong.  For the second prong, petitioners argue that to fail this test, there had to be "no reasonable possibility" of profit, and it is irrelevant whether any potential profit was far less than the expected tax benefits.  Petitioners argue there was a reasonable possibility that the option spread transactions would result in a profit.

### 2.    Respondent's Arguments

Respondent has three interrelated arguments for not allowing the LLCs to avail themselves of subchapter K and be treated as partnerships for Federal tax purposes:  the sham partnership doctrine, the economic substance doctrine, and the

[*28] antiabuse rules promulgated under section 1.701-2, Income Tax Regs.[7]  In support, respondent avers:  (1) the corporations were members of the LLCs for a short time pursuant to a prearranged plan, (2) the tax benefits associated with the LLCs outweighed any other economic benefits, (3) other investments or structures were not considered by the LLCs or its members, (4) creation of the LLCs was unnecessary, (5) the option spread transactions had no reasonable prospect of profit when they were entered into, and (6) there was no nontax business purpose for entering into the option spread transactions.

C.    Discussion

We have made findings consistent with all but respondent's fifth averment, and we are not persuaded by petitioners' arguments to the contrary.  Large guaranteed tax benefits combined with the possibility of making a relatively small profit is relevant and does not create a valid business purpose.  See Humboldt Shelby Holding Corp. v. Commissioner, at *16.  The evidence is overwhelming that the LLCs were created and the option spread transactions were executed exclusively for tax avoidance purposes:  (1) Mr. Haber openly advertised the

---

[7]Petitioners argue that we cannot rely on sec. 1.701-2, Income Tax Regs., because either it does not authorize the Commissioner to disregard partnerships, or if it does, it is invalid.  Though respondent cites sec. 1.701-2, Income Tax Regs., as one of his many grounds for disregarding the LLCs, we do not rely on it and see no need to address petitioners' arguments.

[*29] strategy as a way to generate tax losses, (2) the LLCs themselves engaged in no transactions besides the economic equivalent of putting money in a bank, (3) each corporation joined and resigned from the LLCs within the year, (4) participating in the transactions caused each corporation to completely offset what otherwise would have been a substantial tax liability, and (5) if foreign currency investing and diversification were the goal, there were simpler alternatives with a higher probability of generating profit.

We have several times analyzed nearly identical schemes and have not recognized the entities involved for tax purposes. See 436, Ltd. v. Commissioner, at *34; Markell Co. v. Commissioner, at *31; 6611, Ltd. v. Commissioner, at *60-*61; Palm Canyon X Invs., LLC v. Commissioner, 2009 WL 4824326, at *27; see also New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. at 185 (disallowing the losses because the "transaction lacked economic substance"); Humboldt Shelby Holding Corp. v. Commissioner, at *20 (similar). Each scheme involved an entity (partnership or LLC) whose sole purpose was to provide its members with a high-basis membership interest to be disposed of at a loss (or, on its redemption, to put high-basis entity assets into the hands of the member, who would then dispose of them at a loss). The facts here do not differ materially from those in the cited, and similar, cases. The LLCs were created solely for tax

[*30] avoidance purposes, and, for that reason, we do not recognize them as entities for Federal tax purposes. Since they are not tax-recognized entities, they are ineligible to be classified as partnerships for Federal tax purposes. See sec. 301.7701-3(a), Proced. & Admin. Regs. Because they cannot be classified as partnerships for Federal tax purposes, "there was no partnership loss, and there were no partnership deductions, no contributions to the purported partnership, and no distributions from a partnership to its purported partners. Adjustment of those [partnership] items to zero is appropriate." Tigers Eye Trading, LLC v. Commissioner, 138 T.C. at 107. Likewise, because the LLCs are not tax-recognized entities, neither the corporations nor DGI or Alpha could have any membership interest in the LLCs in which they could have any tax basis. See Logan Tr. v. Commissioner, 616 F. App'x at 429 (emphasizing that a court "[is] not required to shut its eyes to the legal impossibility of any partner's possessing an outside basis greater than zero in a partnership that, for tax purposes, d[oes] not exist" (quoting United States v. Woods, 571 U.S. ___, ___, 134 S. Ct. 557, 565 (2013))). Except with respect to the penalties and ADI's interest expense, we sustain respondent's partnership-item adjustments and partnership-level determinations.

**[*31]** III.    The Interest Expense Reported by ADI

On its 2000 Form 1065, ADI reported a net gain from its option activity of $161,744 and claimed an investment interest expense deduction of $772. Respondent by the FPAA reversed both items.  Section 163 allows a taxpayer to deduct interest paid or incurred within the taxable year on indebtedness. Respondent argues that we should not allow ADI its interest deduction since it paid the $772 in furtherance of a tax-motivated transaction lacking economic substance.  See, e.g., Winn-Dixie Stores, Inc. v. Commissioner, 113 T.C. 254, 294 (1999), aff'd, 254 F.3d 1313 (11th Cir. 2001).  We have agreed with respondent that ADI is not a tax-recognized entity, so, on that ground, denying ADI any interest deduction (and eliminating its reported gain) is appropriate.  The question still remains whether, disregarding ADI, any of the corporations can deduct the interest.  Respondent, on whom we have placed the burden of proof, has failed to trace the indebtedness associated with ADI's $772 interest payment.  See sec. 1.163-8T(a)(3), Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987) (interest expenses on a debt allocated in the same manner as the related debt is allocated; debt is allocated by tracing the proceeds to specific expenditures).  In his opening brief, respondent six times describes the interest as an "investment interest expense".  He has not shown that the interest was not incurred on

[*32] indebtedness and paid. He has not shown that the related indebtedness is not allocable to the option transactions that produced the $161,744 of gain reported by ADI. Respondent has not convinced us that the interest, if so incurred, was not an expense connected with an income-producing activity. We do not understand respondent's position to be that the corporations need not include $161,744 in gross income. We will allow a deduction of the $772 of investment interest.

IV.     Consequences of the LLCs' Not Being Tax-Recognized Entities

We have determined that the LLCs are not recognized as entities for Federal tax purposes and, thus, cannot elect to be taxed as partnerships. As discussed supra, we still have jurisdiction to determine items that would be partnership items if tax-recognized entities had filed the returns that the LLCs did file. We have said that a disregarded partnership has no identity separate from its owners, and we treat it as just an agent or nominee. 6611, Ltd. v. Commissioner, at *61; see also Tigers Eye Trading, LLC v. Commissioner, 138 T.C. at 94, 96 n.32, 99. We will ask the parties to brief further the treatment of the adjustments that respondent made in the FPAAs.

**[*33]** V.    Penalties

    A.    Jurisdiction Over Penalties

Section 6226(f) grants this Court jurisdiction to determine the applicability of any penalty that could result from an adjustment to a partnership item, "even if imposing the penalty would also require determining affected or non-partnership items". Woods, 517 U.S. at ___, 134 S. Ct. at 564. That also includes determining the penalties that could be triggered by our determination that no entities exist for Federal tax purposes. See id. Our determination of accuracy-related penalties is provisional because further determinations may still have to be made at the putative partner level. See id.

    B.    Applicability of Accuracy-Related Penalty

Section 6662(a) and (b)(1), (2), and (3) imposes an accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to, among other things, negligence or disregard of rules or regulations, a substantial understatement of income tax, or a substantial valuation misstatement. The penalty is 20% of the portion of the underpayment of tax to which the section applies. Sec. 6662(a). In the case of a gross valuation misstatement, 20% is increased to 40%. Sec. 6662(h)(1). Only one accuracy-related penalty may be applied with respect to any given portion of an underpayment, even if that portion

**[\*34]** is subject to the penalty on more than one of the grounds set out in section 6662(b).  Sec. 1.6662-2(c), Income Tax Regs.  Nevertheless, we will consider the three grounds advanced by respondent for application of the penalty, viz, negligence, a substantial understatement of income tax, and a gross valuation misstatement.  We will also consider petitioners' reasonable cause defenses.

      1.    Negligence

A 20% penalty applies to any portion of an underpayment of tax attributable to negligence or disregard of rules or regulations.  The term "negligence" includes "any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws" or a failure to exercise "ordinary and reasonable care in the preparation of a tax return."  Sec. 1.6662-3(b)(1), Income Tax. Regs.  "The term 'disregard' includes any careless, reckless or intentional disregard of rules or regulations."  Id. subpara. (2).  Nevertheless, a taxpayer has not disregarded a rule or regulation if the contrary position has a realistic chance of being sustained on the merits.  Id.  "The term 'rules or regulations' includes * * * notices (other than notices of proposed rulemaking) issued by the Internal Revenue Service and published in the Internal Revenue Bulletin."  Id.

The IRS released Notice 2000-44, supra, more than a year before the LLCs' Forms 1065 were filed and published it in the Internal Revenue Bulletin.  Mr.

[*35] Haber was the architect of FXIS and the de facto manager of the LLCs. The notice describes almost exactly the abusive transactions in these cases. In implementing FXIS and causing the LLCs to file partnership returns and to take the return positions that they did, Mr. Haber acted with, at a minimum, careless disregard for rules or regulations. And that conduct satisfies section 6662(b)(1) unless his contrary position has a realistic chance of being sustained on the merits. Petitioners argue that the law was uncertain in 2001 when the LLCs' returns were filed. Perhaps it was, but that does not necessarily lead to the conclusion that the LLCs--necessary to implement FXIS--would be respected for tax purposes. The long list of cases with which we begin this report is evidence that it was unreasonable to believe that the LLCs would be recognized for tax purposes. Underpayments of tax by the corporations resulting from respondent's disregard of the LLCs are attributable to Mr. Haber's (acting for the LLCs) disregard of rules or regulations.

2.    Substantial Understatement of Income Tax

A 20% penalty applies to any portion of an underpayment of tax attributable to any substantial understatement of income tax. The term "understatement" means the excess of the amount of the tax required to be shown on the return for the taxable year, over the amount of the tax imposed which is shown on the return,

[*36] reduced by any rebate. Sec. 6662(d)(2)(A). Except in cases involving tax shelters, an understatement is reduced by the portion of the understatement that is attributable to the tax treatment of an item for which there is substantial authority, or with respect to which there is adequate disclosure. See sec. 6662(d)(2)(B) and (C). The understatement cannot be reduced at all for any item of a corporation attributable to a tax shelter. See sec. 6662(d)(2)(C)(ii). The term "tax shelter" is defined in section 6662(d)(2)(C)(ii) to mean: "(I) a partnership or other entity, (II) any investment plan or arrangement, or (III) any other plan or arrangement, if a significant purpose of such partnership, entity, plan, or arrangement is the avoidance or evasion of Federal income tax." The corporations and DGI are corporate taxpayers.[8] We have determined that the LLCs are not tax-recognized entities, but certainly FXIS is an investment plan or strategy and at least a significant purpose of that strategy is Federal income tax avoidance. The corporate tax shelter exception applies so that none of any of the corporations' or DGI's understatements of income tax attributable to respondent's adjustments in the FPAA may be reduced on account of substantial authority or disclosure. The

---

[8]The only noncorporate member of the LLCs was Alpha, which, respondent represents, received only negligible allocations of partnership items, the disallowance of which would not result in a substantial understatement of its income tax, so that the noncorporate tax shelter standard, see sec. 6662(d)(2)(C)(i), is not relevant.

**[*37]** determination whether any of the corporations or DGI substantially understated its income tax is not made in this entity-level proceeding.

### 3. Gross Valuation Misstatement

The gross valuation misstatement penalty is a 40% penalty that applies to any portion of an underpayment of tax required to be shown on a return that is due to the taxpayer's overstating the value of, or his basis in, property by 400% or more of its true value. See sec. 6662(h)(2). When a property's true basis is zero, the gross valuation misstatement penalty is automatically triggered if the taxpayer claimed on his tax return that the property had any basis at all. See sec. 1.6662-5(g), Income Tax Regs. Here, the property is an LLC membership interest, and the issue is whether any of the corporations overstated their bases in their membership interests. But we have determined that the LLCs are not tax-recognized entities. That being the case, there could be no tax-recognized LLC membership interest in which any corporation could have any tax basis. "It follows, therefore," the Court of Appeals stated in Logan Tr. v. Commissioner, 616 F. App'x at 429, "that any partner who claimed his outside basis as a loss on

**[\*38]** his tax return faces a potential gross valuation-misstatement penalty for doing so."[9]

#### C.  Reasonable Cause

Section 6664(c) provides an exception to the section 6662(a) accuracy-related penalty if there was reasonable cause for the portion of the underpayment subject to the penalty and the taxpayer acted in good faith with respect to that portion.  We have determined that the LLCs are not tax-recognized entities.  Nevertheless, we treat the LLCs' returns as if each was filed by an entity, see sec. 6233(b); sec. 301.6233-1(d), Proced. & Admin. Regs.; sec. 301.6233-1T(a), (c)(1), Temporary Proced. & Admin. Regs., supra, and consider whether Mr. Haber, as manager of the LLCs, can provide such reasonable cause and good-faith action.  See sec. 1.6664-4(d), Income Tax Regs. (2001).  Section 1.6664-4(b)(1), Income Tax Regs., provides:

---

[9]It is unclear whether respondent considers zero to be the base for determining whether any of the corporations overstated its outside basis.  Respondent states on brief that he "would decrease the outside bases claimed by the ADI and ADG Investors to an amount reflecting their actual economic investment."  He provides a table of those amounts (ranging from $50,000 to $1,000,000), and he claims that the corporations "claimed artificial tax benefits ranging from 29 to 389 times their respective economic investments."  The determination of any underpayment due to a valuation misstatement is not made in this entity-level proceeding.

[*39] The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. * * * Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of * * * law that is reasonable in light of all of the facts and circumstances, including the experience, knowledge, and education of the taxpayer. * * *

As to whether the corporations can avoid any accuracy-related penalties on the basis of Mr. Haber's honest misunderstanding of the law, we reach the same conclusion here that we reached in Markell Co. v. Commissioner, at *38, and Humboldt Shelby Holding Corp. v. Commissioner, at *25. We are not hampered by the lack of any testimony by Mr. Haber. On the evidence before us, we agree completely with what we said in Markell Co. v. Commissioner, at *38: "Haber is a sophisticated tax planner who deliberately exploited a perceived loophole in the law to try to eliminate a substantial built-in capital gain. Haber's extreme sophistication defeats any effort to say this attempted manipulation of the partnership form and indifference to an applicable regulation was done in good faith."

As we reported previously, AD Inv. 2000 Fund LLC v. Commissioner, 142 T.C. 248, 252 (2014), petitioners do not assert any advice-of-counsel defense as giving rise to reasonable cause for any resulting underpayments of tax. On brief they claim substantial authority for the tax positions taken by the LLCs on their

**[\*40]** returns:  "[I]n brief, Mr. Haber would have relied on <u>Helmer v. Comm'r</u>, \* \* \*, along with various Internal Revenue Code provisions and judicial decisions, for the proposition that a transaction could increase outside basis by contributing to a partnership an asset together with an offsetting undertaking that was not a 'liability' for tax purposes."  We have several times explained that <u>Helmer</u> is distinguishable and reliance on it is not reasonable.  <u>Markell Co. v. Commissioner</u>, at \*38-\*39; <u>Humboldt Shelby Holding Corp. v. Commissioner</u>, at \*25-\*26; <u>accord</u> <u>NPR Invs., L.L.C. v. United States</u>, 740 F.3d 998, 1013 (5th Cir. 2014) (stating as to <u>Helmer</u>'s providing substantial authority for reduction of substantial understatement of income tax:  "When the underlying transactions lack economic substance, <u>Helmer</u> cannot provide substantial authority.").  <u>Helmer</u> warrants no further discussion.

Petitioners have not shown that, on the basis of Mr. Haber's actions, the corporations acted with reasonable cause and in good faith with respect to any resulting underpayments of income tax.

<u>An appropriate order will be issued</u>.